## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ADAM M. HOMER<br>HILARY HOMER (Derivative Claim).<br><br>Plaintiffs,<br><br>vs.<br><br>THE PENNSYLVANIA STATE UNIVERSITY, MISSY HNATKOVICH, INDIVIDUAL, JACQUELINE EDMONDSON, Ph.D., INDIVIDUAL MELISSA CAMACHO-HEENAN, INDIVIDUAL<br><br><br>Defendants. | Case No.  2:22-CV-1570 |

## <u>COMPLAINT AND DEMAND FOR JURY TRIAL</u>

Adam M. Homer ("Mr. Homer" or "Plaintiff") and Hilary Homer ("Ms. Homer" or "Plaintiff") move the Court for entry of judgment in their favor against the named Defendants and in support of such Complaint avers as follows:

## PARTIES, JURISDICTION AND VENUE

1.      This Honorable Court has jurisdiction pursuant to 28 U.S.C. §1331 as this case arises under and pursuant to federal law specifically, 42 U.S.C. § 1983 and

the First and Fourteenth Amendments to the United States Constitution, brought to remedy a violation of the constitutional rights of Adams M. Homer; 42 U.S.C. §1983 Deprivation of Due Process Rights and under the Fourth Amendment to the United States Constitution, the Genetic Information Nondiscrimination Act ("GINA") and Title VII (Religion). Moreover, this Honorable Court has jurisdiction over Plaintiff's state law claims and his spouses derivative claim to the extent that he pleads them pursuant to 28 U.S.C. §1367.

2.    Venue lies within the Western District of Pennsylvania pursuant to 28 U.S.C. §1391(b) (2) as the facts and occurrences, acts and/or omissions, and incidents and/or actions alleged herein took place within this judicial district.

3.    Plaintiffs bring this action against Mr. Homer's former employer, The Pennsylvania State University, ("Defendant" or "PSU"). PSU is a Pennsylvania Educational Institution principally located for this case at 4000 University Drive, McKeesport, PA 15132.

4.    Defendant Missy Hnatkovich ("Ms. Hnatkovich" or "Individual Defendant 1") is an adult female and upon information and belief, resides within in the Commonwealth of Pennsylvania. Ms. Hnatkovich was formerly employed by PSU as Regional Human Resources Strategic Partner (she is now employed at Carnegie Mellon University, as of March 2022, as HR Business Partner). Ms. Hnatkovich was in the supervisory line of succession relative to the Plaintiff and

participated in the decisions to enforce discipline and/or to terminate employees including the Plaintiff.

5.    Defendant Jacqueline Edmondson ("Dr. Edmondson" or "Individual Defendant 2") is an adult female and upon information and belief, during the operative time, formerly resided within in the Commonwealth of Pennsylvania. Dr. Edmondson was employed by PSU as Chancellor and Chief Academic Officer (as of June 2022 she is the President of the University of Southern Maine). Dr. Edmondson was in the supervisory line of succession relative to the Plaintiff and participated in the decisions to enforce discipline and/or to terminate employees including the Plaintiff.

6. Defendant Melissa Camacho-Heenan ("Ms. Camacho-Heenan" or "Individual Defendant 3") is an adult female and upon information and belief, resides within in the Commonwealth of Pennsylvania. Ms. Camacho-Heenan is employed by PSU as Senior Labor Relations Specialist. Ms. Camacho-Heenan was in the supervisory line of succession relative to the Plaintiff and participated in the decisions to enforce discipline and/or to terminate employees including the Plaintiff

7.    Defendant PSU is a recipient of federal financial assistance through, *inter alia*, funded programs sponsored by, *inter alia*, the American Recovery and Reinvestment Act of 2009, other Federal Stimulus funds, Research funding,

Higher Education Emergency Relief Fund ("HEERF"), and federal resources from which the U.S. Department of Education advises PSU to use the money for additional nonrecurring expenses like purchasing equipment, teaching resources like books, and software.

8. Mr. Homer is an adult male who, at all relevant times hereto, resides in the Commonwealth of Pennsylvania, Allegheny County, and was employed by PSU as the Physical Plant Manager and Facilities Manager.

9. Ms. Homer is an adult female who resides in the Commonwealth of Pennsylvania and is the spouse of Mr. Homer, and was, directly and indirectly exposed to, and harmed by the actions of the Defendants. She makes a derivative claim for loss of consortium through her husband seeking damages for harms caused by the Defendants.

## UNDERLYING FACTS

10. Mr. Homer commenced employment with PSU on January 15, 2018. He held the position of Facilities Manager and was later promoted to Physical Plant Manager and Facilities Manager.

11. Mr. Homer and his wife are practicing Christians.

12. Pursuant to his sincerely held religious beliefs, Mr. Homer desired to continue, as he had for years, to engage in religious expression at PSU. Furthermore, Mr. Homer had a right to express speech that is religious, or political.

4

13.   At all times, Mr. Homer performed all duties as "above expectations" at PSU and was never substantively disciplined while in employment with PSU.

14.   In April and May of 2020 masks were not required at PSU as the CDC had reported that masks were not effective in stopping the transmission of the COVID-19 virus. At this time there were many essential personnel still working on the campus that were requesting masks as they wanted to wear them and were not able to find any in local stores. PSU was not requiring masks and were not providing them to employees at that time. This notwithstanding, the Plaintiff and his mother made masks for students and employees as there had not been enough masks to go around on campus. They made masks for faculty, staff, and students that were continuing to be present on campus during the initial closure phases of the Pandemic.

15.  In August of 2020 PSU and the CDC changed their stance on masks and PSU initiated the "Mask-up or Pack-up" requirement for all non-union staff, faculty, and students. This policy would later be changed on multiple occasions, and as of late July/early August of 2021 masks were only required for unvaccinated non-union workers who did not provide their vaccination status to PSU. It is important to note that, masking was still not a requirement of the Union Employees (of whom Plaintiff was the direct supervising manager and that at many points in the policy changes, Plaintiff was the only person in his shop required to follow

masking and testing, and later vaccination requirements. The Union employees did not need to follow these policies. The Union employees were not required to do the things that Plaintiff was seeking accommodation for based upon his religious beliefs; however, as more fully noted within, and below, PSU would not address his accommodation requests, mocked him, harassed him, and made Plaintiff out to be a horrible person.

16. Prior to the Fall of 2021, on or about July 15, 2021, PSU began eliminating signage regarding "Mask Up or Pack Up" masking requirements and moved to a policy that all individuals were required to wear face masks when inside buildings on its campuses. However, during most of the 2021 calendar year, Union employees were not required to follow any university protocols. This included masking.

17. As the Physical Plant Manager, Plaintiff was the only person in his building required to wear a mask. All other employees did not mask, test, or report any information related to vaccination status. In early August 2021, the requirement to DNA test and to mask was placed on all employees who did not share their vaccination status or get vaccinated. The only population that was not included under this directive from PSU was Union Employees, of which Plaintiff was responsible for the direct management and supervision of 14 Union Employees.

18. In the fall of 2021, PSU instituted a policy that all students and faculty who had not been vaccinated or had not "…shared with PSU that they have been vaccinated" would be required to be tested for COVID-19. However, as of the fall of 2021, there was no PSU requirement for COVID-19 vaccines.

19. Further, in 2021, PSU instituted a policy that individuals with religious beliefs could seek accommodations (or exemptions) from policies as to vaccines, testing or masking.

20. In 2021 and 2022, PSU, however, and its agents, including Ms. Hnatkovich and Dr. Edmondson, began a policy of segregating unvaccinated employees and employees who sought religious exemptions as more fully described above.

21. In fact, PSU tacitly approved of a policy of failing to interact in good faith regarding religious accommodation and exemption requests as well as religious expression in the workplace by those who sought to express themselves.

22. Furthermore, in 2021 and 2022, PSU and its agents, including Ms. Hnatkovich and Dr. Edmondson, engaged in efforts to chill and quell religious expression and political discourse as well as expression of speech under the First Amendment.

23. Specifically, on or about July 26-28, 2021, Mr. Homer had a verbal discussion with Ms. Hnatkovich focused on his religious beliefs and requests for accommodations associated with the Masking Mandate and DNA Testing. The

Vaccine was not a requirement at that time. In late December 2021, the COVID-19 Vaccine was mandated, and Plaintiff sought a religious exemption.

24.   In July meetings (held July 26-28, 2021) Ms. Hnatkovich, after Plaintiff raised his desire to explore religious exemptions, questioned Plaintiff about his religion, mocked his beliefs, claiming that it was "politics" and stated that he was "not in a protected class."

25. This was the beginning of the end for Plaintiff's career with PSU as the actions of Ms. Hnatkovich chilled Plaintiff's religious accommodation inquiries and political and speech expression (to the extent he communicated it) and began the downward trend of viewing the Plaintiff as a religious fanatic in an effort to isolate and ostracize him and eventually remove him from his job paying over $94,000 per year. The Plaintiff verbally, and in writing, opposed the treatment and retaliatory animus by the named defendants (see Exhibit A).

26. On or about July 28, 2021, Ms. Hnatkovich wrote up the Plaintiff for alleged non-compliance with masking protocols despite the fact that during this time, Plaintiff was being provided accommodations from his then, current direct supervisor, Dave DeNardo, regarding masking. Mr. Denardo and Plaintiff discussed, on a weekly basis, that there were times that he would ask Plaintiff to wear a mask in larger public meetings or settings. However, the masking policy was not enforced on a regular basis. Plaintiff attended meetings with both Mr.

DeNardo and Dr. Edmondson where no one wore a mask. This created a great deal of confusion for the Plaintiff given he believed he had been accommodated by Mr. DeNardo.

27. Further, on September 15, 2021, Ms. Hnatkovich wrote up Plaintiff once again for allegedly lying about his vaccine status and his activities prior to quarantine in an effort, again, to chill and quell the expression of Plaintiff's faith in the workplace.

28. Plaintiff was then told if he chose not to be vaccinated, he would be sent to a re-education program until he learned to comply.

29. Then, yet again, Ms. Hnatkovich wrote up the Plaintiff for being one-day late in getting a COVID-19 test (DNA test) even though he explained that he was doing multiple tasks since his direct report had left, and he was trying to keep up with his responsibilities and those of many others, without extra pay. Importantly, Plaintiff was taking the DNA tests at this time because it was made clear to him that he would lose his job if he did not comply. However, no one was addressing Plaintiff's repeated requests for religious accommodations except Mr. DeNardo who had recently departed for another position elsewhere.

30. Furthermore, and critically, neither Ms. Hnatkovich nor any other agent of PSU ever investigated whether the Plaintiff could be accommodated. Instead, he was subsequently harassed and demeaned for seeking to exercise his faith-based

privileges. Once more, at no time did Ms. Hnatkovich or Dr. Edmondon investigate the Plaintiff's opposition to what he perceived to be retaliation for expressing his beliefs (see Exhibit A).

31. In fact, during other Labor Relations ("LR") proceedings, LR representatives and Human Resources allowed Plaintiff to be bullied, allowing yelling and slanderous accusations to be made against Plaintiff. Plaintiff's direct report, Mr. DeNardo, verbalized and sent emails to Ms. Hnatkovich on and about July and August 2021 regarding Plaintiff and the way he was being mistreated, yet nothing was ever done to prevent or remedy the treatment, even though Dr. Edmondon herself agreed that the "bullying tactics" needed to be addressed.

32. Later in August 2021, mask mandates were applied but changed repeatedly during the fall of 2021. Further, testing was enforced, but individuals who had taken the Covid-19 Vaccines were not required to be tested. Many were required to give saliva samples for DNA testing or be disciplined and lose their jobs.

33. Further, Plaintiff explained that he believed that the requirement violated his privacy rights and the Genetic Information Nondiscrimination Act ("GINA") as it was not being used for diagnostic purposes but genetic information to be used for research purposes and was a human rights violation.

34. On October 14, 2021, Plaintiff filed an online application with the Equal Employment Opportunity Commission ("EEOC") as well as with PSU attesting

that he had been discriminated against due to religion, creed, and genetic information. This Charge was docketed as 530-2022-00678, and dually filed with the Pennsylvania Human Relations Commission ("PHRC") and included averments covering discrimination and retaliation on the basis of seeking an exemption regarding COVID-19 vaccinations, masking and DNA testing as Plaintiff felt that since he had sought accommodations for the vaccine and was denied and harassed, so he sought to protect his rights.

35.  Plaintiff was perplexed as to why his beliefs would not be taken seriously. As he had sought out assistance with Mr. DeNardo, his direct report who was open to interaction, but PSU took no action to interact in good faith.

36. At this time of the Pandemic Response, as per the CDC, local and PSU policies regarding vaccines and even masking was in flux, changing on a regular basis. Additionally, as previously noted, Mr. DeNardo, was planning to leave in August 2021 for Sewickley Academy. Mr. DeNardo attempted to work with the Plaintiff regarding his accommodation requests and was, in fact, offering him accommodations prior to leaving. Again, the inconsistent messages received from PSU and its agents left the Plaintiff confused and discouraged.

37.  At this time, PSU's action and inaction began to create stress and anxiety for his family.

38.  On December 15, 2021, Plaintiff wrote to the Affirmative Action Office at PSU seeking accommodations for the COVID-19 vaccine, testing and masking. There were many accommodations that could have been provided such as coming in early to do inspections or staying late when he would not have been around others, or zoom, and/or using Teams to have meetings when necessary. The only people he was around were Union employees that, as previously stated, did not need to follow PSU's COVID policies.

39.  On January 6, 2022, Plaintiff sent another letter to the Affirmative Action Office at PSU reporting that he had, first, made multiple attempts to seek accommodations for his religious beliefs which were then chilled by Ms. Hnatkovich who took it upon herself to opine in initial meetings that the Plaintiff has no religious beliefs, that he was a liar, that he was expressing stating political positions and beliefs, and if he did not conform to taking vaccines he would be sent to a re-education program. Second, that Plaintiff had still received no interaction about the accommodation requests for DNA testing or masking (as he had been on the PSU rollercoaster during the Pandemic that allowed people to go maskless (as they did during the first part of the Pandemic) and then require masking, only to be told not long after that masking was no longer required. The inconsistencies at PSU were puzzling and incoherent throughout the Pandemic. Third, the Plaintiff expressed that he had been given no guidance on whether the

COVID-19 testing (which was only required of unvaccinated or un-shared vaccination status) was in fact taking the genetic make-up of individuals in an effort to identify a certain segment of the population and their COVID-19 health status while blatantly using the testing for research processes against the will of employees and students and without their informed consent. Finally, he stated that he was being harassed, ostracized, had had filed an EEOC charge, and still had not be answered regarding his numerous attempts to seek interaction. Additionally, and critically, that Plaintiff and his family was experiencing health concerns due to the increased level of stress from the continuous attacks and harassment and the hostile working conditions.

40. On January 10, 2022, PSU finally decided to respond to the Plaintiff's allegations and attempts at interaction regarding accommodation focusing exclusively on an inconsistent masking policy when Ms. Hnatkovich and Dr. Edmondson terminated the Plaintiff without any investigation into any of his accommodation requests due to their disdain for people of faith and individuals seeking accommodations based on their faith.

41.    Subsequently, Plaintiff filed a Dually Filed Charge with the EEOC and the PHRC on or about January 3, 2022, docketed as 530-2022-00116.

42.  Both of Plaintiff's Charges were dismissed with a right to sue on August 18, 2022 (see Exhibit A). All administrative remedies have been exhausted pursuant

to Title VII and which are filed herein. The Pennsylvania Human Relations Act ("PHRA") claims will be provided under amendment once those claims have been fully exhausted.

43.    The Defendants' actions or inaction are of a continuing nature thus they fall under the doctrine of a continuing violation theory.

44.    PSU is responsible/liable for the actions of its agents under a theory of *Respondeat Superior.*

## **RELIGIOUS DISCRIMINATION - REASONABLE ACCOMODATION OPTIONS UNJUSTIFIABLY REJECTED BY PSU**

45. PSU could have accommodated Plaintiff's sincere religious beliefs without undue hardship (indeed, with little cost by allowing Plaintiff to zoom or use MS Teams for meetings and to come in at less busy periods to avoid contact with others). PSU failed to engage in the interactive process to legitimately consider all possible accommodations. This caused PSU to overlook accommodations posing less than a *de minimis* burden including: (1) testing for COVID antibodies and acknowledging that Plaintiff's natural immunity satisfied PSU's immunization requirements (because it is superior to vaccine-induced immunity); (2) zoom or MS Teams meetings; (3) limited exposures by making modifications to Plaintiff's work schedule; or (4) any combination of the above.

46. At the time of Plaintiff's termination, the CDC had conclusively stated that individuals vaccinated for COVID-19 could nevertheless contract and spread COVID-19. On March 29, 2021, the Director of the CDC Rochelle Walensky publicly stated that the CDC's own data "suggests, you know, that vaccinated people do not carry the virus, don't get sick, and that it's not just in the clinical trials but it's also in real world data."[1]

47. However, because the real-world data already demonstrated breakthrough infections in the vaccinated just three months after the Pfizer-BioNTech vaccine received FDA approval, the CDC immediately thereafter clarified Director Walensky's statements and confirmed that vaccinated individuals do in fact become infected and spread the virus to others. *See* CDC Reverses Statement by Director, (April 2, 2021), available at: https://thehill.com/changingamerica/well-being/546234-cdc-reverses-statement-by-director-that-vaccinated-people-are-no/.

48. Before instituting its vaccination policy, PSU knew or should have known that the vaccines were largely ineffective at controlling the spread of COVID-19. As early as July 2021, Director Walensky admitted that the vaccinated had similarly

---

[1] Statement from CDC Director Rochelle P. Walensky, MD, MPH on Rachel Maddow Show (March 29, 2021), transcript available at: https://www.msnbc.com/transcripts/transcript-rachel-maddow-show-3-29-21-n1262442?utm_content=buffer7fb12&utm_medium=Arianna&utm_source=LinkedIn&utm_campaign=Buffer.

high viral loads of SARS-CoV-2 as the unvaccinated and thus could still contract and spread the Delta variant.[2]

49. In August 2021, a joint study by CDC and the Wisconsin Department of Health services further confirmed Director Walensky's admission. The study indicated that vaccinated individuals had a 5% higher viral load than the unvaccinated and were not only just as likely to transmit the virus as the unvaccinated but posed a greater contagion risk due to the increased likelihood of asymptomatic infection.[3]

50. Highlighting the irrationality of PSU's continued pursuit of enforcing its mandate against religious employees, PSU refused to recognize natural immunity as satisfying its immunization requirement. This is despite the fact that the international scientific community had conclusively established through centuries of research that natural immunity is superior to vaccine-elicited immunity. *See Plotkin's Vaccines*, 7th Edition, at Section 2.

---

[2] *Statement from CDC Director Rochelle P. Walensky, MD, MPH on Today's MMWR*, CDC News Room (July 30, 2021), available at https://www.cdc.gov/media/releases/2021/s0730-mmwr-covid-19.html [https://perma.cc/VR5V-E67A] ("Today, some of those data were published in CDC's Morbidity and Mortality Weekly Report (MMWR), demonstrating that Delta infection resulted in similarly high SARSCoV-2 viral loads in vaccinated and unvaccinated people. High viral loads suggest an increased risk of transmission and raised concern that, unlike with other variants, vaccinated people infected with Delta can transmit the virus.").

[3] *See* Kasen Riemersma, et. al, *Shedding of Infectious SARS-CoV-2 Despite Vaccination*, *medRxiv* (August 24, 2021), available at: https://www.medrxiv.org/content/10.1101/2021.07.31.21261387v4.full.pdf.

51. PSU is a sophisticated higher education university which focuses on sophisticated medical and scientific educations and should have been aware of the fallacy of enforcing its vaccination Policy in the context of undue hardship and failed to even consider the religious beliefs of Plaintiff when determining whether it could exempt him.

52. Recognizing Plaintiff's natural immunity to COVID-19 as an alternative to vaccination would have required no cost or action of PSU and would have imposed no logistical or administrative burden on PSU. It would have simply required that PSU acknowledge scientific reality.

53. Alternatively, allowing Plaintiff to modify his schedule and to conduct zoom or Teams meetings would also have been a costless accommodation. As the CDC recognized in August of 2021, COVID-19 vaccines work "with regard to severe illness and death—they prevent it. But what they can't do anymore is prevent transmission."[4]

54. Because vaccinated individuals may also contract and transmit COVID-19, social distancing is a more reliable indication of safety from the virus than a vaccination at some earlier time. This fact was also well-known at the time PSU failed to

---

[4] Statement by Rochelle Walensky, U.S. Centers for Disease Control, CNN Interview (Aug. 5, 2021),
available at https://www.cnn.com/2021/08/05/health/us-coronavirus-thursday/index.html.

accommodate Plaintiff and should have been considered as a reasonable accommodation to the vaccine mandate.

## APPLICABLE LAW

55. Title VII prohibits PSU from discriminating against employees based on their religion. 42 U.S.C. § 2000e-2(a)(1). This "include[s] all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate an employee's . . . religious observance or practice without undue hardship on the conduct of the employer's business." 42 U.S.C. § 2000e(j).

56. In other words, an employer must "make reasonable accommodation for the religious observances of its employees, short of incurring an undue hardship." *EEOC v. Firestone Fibers & Textiles Co.*, 515 F.3d 307, 312 (4th Cir. 2008) (quoting *Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 75 (1977)).

57. This allows a plaintiff to raise claims of religious discrimination under both a disparate treatment theory and a failure-to-accommodate theory. *Chalmers v. Tulon Co. of Richmond*, 101 F.3d 1012, 1018 (4th Cir. 1996).

58. Failure to engage the interactive process to find a solution for an exempt employee "is not an independent violation of Title VII. But as a practical matter, such failure can have adverse legal consequences [because] where an employer has made no effort to act on an accommodation request, courts have found that

the employer lacked the evidence needed to meet its burden of proof to establish that the plaintiff's proposed accommodation would actually have posed an undue hardship." EEOC Guidance, *Section 12: Religious Discrimination*, Part 12-IV.A.2 (citing *EEOC v. Ithaca Indus., Inc*., 849 F.2d 116, 118-19 (4th Cir. 1988) (finding that employer's failure to attempt to accommodate, absent any showing of undue hardship, violated Title VII)); *see also EEOC v. Arlington Transit Mix, Inc.*, 957 F.2d 219, 222 (6th Cir. 1991) ("After failing to pursue . . . any other reasonable accommodation, the company is in no position to argue that it was unable to accommodate reasonably [plaintiff's] religious needs without undue hardship on the conduct on its business.").

59. Title VII also prohibits PSU from retaliating against an employee for engaging in protected activity. *Roberts v. Glenn Industrial Grp.*, 998 F.3d 111, 122 (4th Cir. 2021).

## COUNT 1
## TITLE VII – RELIGIOUS DISCRIMINATION – FAILURE TO ACCOMMODATE
### (42U.S.C. § 2000e-2(a)(1))
### *Plaintiff v PSU ONLY*

60. Plaintiff incorporates herein the previous averments as if fully set forth.

61. An employee may assert a claim for his employer's failure to accommodate his sincere religious beliefs, so long as the accommodation does not impose undue

hardship on the employer. *See EEOC v. Consol Energy, Inc.*, 860 F.3d 131, 141 (4th Cir. 2017).

62. To establish a *prima facie* claim for failure to accommodate a plaintiff must present evidence that: "(1) he or she has a bona fide religious belief that conflicts with an employment requirement; (2) he or she informed the employer of this belief; and (3) he or she was disciplined for failure to comply with the conflicting employment requirement." *Id.* (quoting *EEOC v. Firestone Fibers & Textiles Co.*, 515 F.3d 307, 312 (4th Cir. 2008) (quoting *Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 75 (1977)).

63. Once the plaintiff has made out a prima facie case for discrimination, "the burden then shifts to the employer to show that it could not [reasonably] accommodate the plaintiff's religious needs without undue hardship." *Firestone Fibers*, 515 F.3d at 312 (quoting *Chalmers v. Tulon Co. of Richmond*, 101 F.3d 1012, 1019 (4th Cir. 1996).

64. Plaintiff clearly established his "bona fide religious belief" and its conflict with the Policy when he submitted his religious accommodation request to PSU. Because Plaintiff could not receive the COVID-19 vaccine without violating his religious beliefs, he could not comply with the Policy and was thus subject to adverse action through termination. While PSU may now attempt to challenge Plaintiff's beliefs, it is not the employer's place "to question the correctness or

even the plausibility of . . . religious understandings." *Consol Energy*, 860 F.3d

at 142.

65. PSU provided no reasonable accommodations options to Plaintiff, nor did it

engage in the interactive process to attempt to find a workable accommodation

that would not pose an undue hardship to PSU. Even if not a standalone claim,

the failure to engage in a meaningful interactive process signals an employer's

violation of its duty to accommodate because the employer is attempting to

remain purposefully ignorant of potential reasonable accommodations.

66. To establish the defense of "undue hardship," PSU must demonstrate that any of

the aforesaid accommodations would "bear more than a *de minimis* cost" on the

university. *Hardison*, 432 U.S. at 84. The above stated accommodations required

no additional cost or logistical burden to PSU, as was seen when the university

brought back and accommodated numerous employees from around the country

who also held sincere religious beliefs that prevented them from taking the

vaccine.

67. The ability to provide reasonable accommodations to employees such as Plaintiff

is also evident by considering other entities including countless hospitals and

even COVID-19 vaccine manufacturers such as Janssen (J&J)—that were able to

accommodate employees with religious based objections to mandatory COVID-

19 vaccination policies. Defendant PSU is thus without excuse as to why it failed also to follow federal employment law in this regard.

68. Title VII requires an employer to thoroughly consider all possible reasonable accommodations and not just reject requests out of hand with form denials. "If the accommodation solution is not immediately apparent, the employer should discuss the request with the employee to determine what accommodations might be effective."[5]

69. Such accommodations might include things such as telework, zoom or Teams meetings and modifications in the schedule. In the face of the reasonable options proposed here, PSU cannot demonstrate even a *de minimis* burden in providing Plaintiff with a religious accommodation(s).

70. Further, in denying Plaintiff's request, PSU blankly asserted "significant undue hardship" and provided no justification as to why or how the several options he proposed (and were clearly available) were unable to be done without undue hardship. This is especially true where recognition of Plaintiff's natural immunity and/or continued telework or zoom/Teams meetings or modified scheduling (for example) required no cost, effort, or operational change to the status quo.

71. Moreover, PSU was on actual of notice of both the many possible accommodation options for Plaintiff and the fact that the failure to use one of

---

[5] EEOC Guidance Section 12: Religious Discrimination; Part IV, A.2.

them would result in a Title VII violation. Nonetheless, PSU forged forward with its campaign to eliminate its Christian employees, including Plaintiff.

72. Therefore, PSU unlawfully discriminated against Plaintiff based on his sincerely religious beliefs by failing to accommodate those beliefs. PSU cannot demonstrate that doing so would have imposed any hardship whatsoever, let alone undue hardship.

### COUNT 2
### TITLE VII – RELIGIOUS DISCRIMINATION – DISPARATE TREATMENT - RETALIATION
(42U.S.C. § 2000e-2(a)(1))
*Plaintiff v PSU ONLY*

73. Plaintiff incorporates herein the previous averments as if fully set forth.

74. Title VII also makes it unlawful for "an employer to discriminate against any of [its] employees . . . because he has opposed any practice made unlawful by this subchapter." 42 U.S.C. § 2000e-3(a). 116. A prima facie case for retaliation requires a showing "that (1) she engaged in activity protected by Title VII; (2) that an adverse employment action was taken by the employer; and (3) that a causal link existed between the protected activity and the adverse action." *Roberts*, 998 F.3d at 122.

75. Here, Plaintiff engaged in protected activity under Title VII when he sought a religious accommodation from the Policy that would otherwise require him to violate his sincere religious beliefs. Then, because of his request for an accommodation, PSU subjected Plaintiff to its sham process in violation of

federal law. PSU never intended to accommodate Plaintiff. As a result, he was forced from his employment.

76. Were it not for Plaintiff's religious beliefs and his request for an accommodation, he would not have been subjected to such treatment.

77. Further, PSU hoped that the constant reminder of possible termination would result in Plaintiff abandoning his religious beliefs and surrendering to a coerced injection of a COVID-19 vaccine.

78. PSU' Policy forced those who were denied religious accommodations into a period of extreme emotional and psychological distress, seeking to coerce religious employees into compliance.

79. But for his request for religious accommodation, Plaintiff would not have experienced the psychological and emotional distress from the threat of termination where he was constantly pressured to violate his religious beliefs.

80. Separately, PSU refused to admit its mistake and accommodate the Plaintiff even after it became apparent that (1) accommodations were available; (2) the COVID-19 vaccines were not preventing contraction of the virus; and (3) individuals with natural immunity possessed superior immunity to those with the vaccine only. Such actions were due to Plaintiff's opposition to PSU' illegal employment law practice. PSU had made up its mind to purge as many unvaccinated religious

employees as it believed it could and the position against those seeking accommodations had become entrenched.

81. PSU's actions forced those denied accommodation into threats, cajoling and blatant harassment then on to terminate them after an arbitrary specified period of threats. This constitutes retaliation in violation of Title VII.

## COUNT 3
## TITLE VII – RETALIATION – OPPOSITION/PARTICIPATION CLAUSE
### (42 U.S.C. §2000e-3(a))
#### *Plaintiff v PSU ONLY*

82. Plaintiff incorporates herein the previous averments as if fully set forth.

83. Title VII also makes it unlawful for "an employer to discriminate against any of [its] employees . . . because he has opposed any practice made unlawful by this subchapter." 42 U.S.C. § 2000e-3(a).

84. A *prima facie* case for retaliation requires a showing "that (1) he engaged in activity protected by Title VII; (2) that an adverse employment action was taken by the employer; and (3) that a causal link existed between the protected activity and the adverse action." *Roberts*, 998 F.3d at 122.

85. Here, Plaintiff engaged in protected activity under Title VII when he sought a religious accommodation from the Policy that would otherwise require him to violate his sincere religious beliefs. PSU continued to oppose Plaintiff's unlawful practice through his termination.

86. Then, because of his request for an accommodation, PSU subjected Plaintiff to its process to coerce him from exercising his rights under federal law. PSU Policy was not designed to look for a reasonable accommodation for Plaintiff because PSU never intended to accommodate Plaintiff. Were it not for Plaintiff's Christian beliefs and his request for an accommodation, he would not have been subjected to such treatment.

87. After denying Plaintiff's request, PSU pressured him to capitulate and get the COVID-19 vaccine with false information that PSU could not accommodate his beliefs. PSU then threatened and disciplined him further, despite his opposition to its actions—a further coercive technique—only to terminate him at the end.

88. Upon information and belief, PSU imposed the period of threats and intimidation with the intent to punish those who sought religious accommodations; hoping that the constant reminder of termination would result in them abandoning their religious beliefs and surrendering to a coerced injection of a COVID-19 vaccine.

89. PSU' Policy forced those who were denied religious accommodations into a period of extreme emotional and psychological distress, seeking to coerce religious employees into compliance.

90. But for his request for religious accommodation, Plaintiff would not have experienced the psychological and emotional distress from the period of threats

and unwarranted discipline where he was constantly pressured to violate his religious beliefs.

91. PSU terminated Plaintiff for seeking a religious accommodation to its compulsory vaccination Policy. Plaintiff maintained his request for an accommodation through the date of his termination and opposed the PSU actions and inaction, even contacting the EEIOC and the Affirmative Action Offices of PSU. PSU terminated Plaintiff in close temporal proximity to his requesting a religious accommodation and opposing the same as well as for participating in said opposition and discriminatory filings.

92. PSU' actions in forcing those denied accommodations into a period of threat and intimidation and then subsequent termination constitutes retaliation in violation of Title VII.

## COUNT 4
### VIOLATION OF THE FREE SPEECH CLAUSE OF THE FIRST AMENDMENT TO THE UNITED STATES CONSTITUTION
### *All Defendants*

93. Plaintiff incorporates herein the previous averments as if fully set forth.

94. The First Amendment's Freedom of Speech Clause, incorporated and made applicable to the states by the Fourteenth Amendment to the United States Constitution, prohibits censorship of private religious or political expression.

95. Defendants' COVID-19 Policies and practices provide that unvaccinated, or employees that have not shared whether they are vaccinated were required to

mask and test. Additionally, Defendants' policy regarding COVID-19 vaccines provided that employees who had not been vaccinated must be vaccinated unless they have a religious, or health-based reasons and an exemption.

96. However, upon information and belief, PSU, and its agents, including the Individual Defendants, by policy and custom, refused to engage in a good faith interaction, having no intent to provide religious accommodations for Christians, although upon information and belief, members of other faiths and sects were provided with accommodations and exemptions.

97. Plaintiff's religious expression did not materially and substantially interfere with the orderly conduct of educational activity within PSU.

98. This unequal treatment of Plaintiff based on the religious nature of his private expression is a content-based restriction in an otherwise open forum for employee faith-based expression at PSU.

99. This censorship of Plaintiff's religious speech—while permitting similar, but nonreligious, private speech from other employees, or other employees of the non-Christian faith, regarding the same and similar subject matters—also constitutes viewpoint discrimination, which is unconstitutional in any type of forum.

100. Defendants' COVID-19 Policies, practices and customs additionally impose an unconstitutional prior restraint because they vest PSU officials, including the

Individual Defendants, with unbridled discretion to permit or refuse protected religious expression by Plaintiff.

101.    Defendants' COVID-19 Policies, practices and customs give unbridled discretion to PSU officials including the Individual Defendants to decide what forms of expression Christian employees are permitted to engage in during the Pandemic and to ban any other expression—including the expression of religious beliefs or religious topics—at the whim of the officials.

102.    Defendants' COVID-19 Policies, practices and customs are additionally overbroad because they sweep within their ambit protected First Amendment expression, including that of political expression when Ms. Hnatkovich claims the Plaintiff's religious beliefs are really political beliefs, thus chilling the expression of either.

103.    The overbreadth of Defendants' COVID-19 Policies, practices and customs chilled the speech of Plaintiff who sought to engage in private religious expression during the Pandemic with respect to his faith and its impact upon his decision to vaccinate, test or mask.

104.    Defendants' COVID-19 Policies, practices and customs, chill, deter, and restrict Plaintiff from freely expressing his religious views through his efforts to seek workplace accommodations and express his love for Jesus Christ and his biblical principles.

105.    Defendants' COVID-19 Policies, practices, and customs, as interpreted and applied by the Defendants to prohibit religious and political speech, are not the least restrictive means necessary to serve any compelling interest which Defendants seek thereby to secure.

106.    Defendants' COVID-19 Policies, practices and customs are not reasonably related to any legitimate employment concerns especially given the inconsistencies, incoherencies, and repeated modifications of the policies and customs.

107.    Censoring employee's religious speech per se is not and cannot be a legitimate employment concern.

108.    Defendants' COVID-19 Policies, practices and customs accordingly violate Plaintiff's right to Free Speech under the First Amendment to the United States Constitution, as incorporated and applied to the Defendants under the Fourteenth Amendment.

WHEREFORE, Plaintiff respectfully prays that the Court grant the relief set forth hereinafter in the Prayer for Relief.

## COUNT 5
## VIOLATION OF THE FREE EXERCISE CLAUSE OF THE FIRST AMENDMENT TO THE UNITED STATES CONSTITUTION
### *All Defendants*

109.    Plaintiff incorporates herein the previous averments as if fully set forth.

110.    Plaintiff desires to engage in the expressive activities described above on the basis of his sincerely held religious beliefs and/or based upon political persuasion if he so chooses, albeit his religious expression was the paramount concern when seeking exemptions and/or accommodations during the Pandemic.

111.    Defendants' COVID-19 Policies, practices and customs substantially burdens Plaintiff's free exercise of religion by conditioning his right to speak about his religious beliefs on the surrendering of his free exercise rights.

112.    Defendants' COVID-19 Policies, practices and customs are not neutral or generally applicable as they deny Plaintiff the ability articulate his faith-based Christian beliefs in a safe and respectful environment.

113.    Defendants' COVID-19 Policies, practices and customs are not neutral because they target religious speech and permit PSU officials like Defendants' Ms. Hnatkovich and Dr. Edmondson to arbitrarily decide what speech is permitted under the policy, practice and customs and what speech is not.

114.    Defendants' COVID-19 Policies, practices and customs are likewise not generally applicable because they grant PSU officials including Ms. Hnatkovich and Dr. Edmondson unbridled discretion, enforced via a policy or custom of individualized religious belief assessments, to censor Plaintiff's religious expression while permitting other non-Christian faiths to engage in religious

expression or non-religious employees to engage in non-religious expression during the Pandemic.

115.    Defendants' COVID-19 Policies, practices and customs constitute the imposition of special disabilities on Plaintiff due to his religion and his intent to engage in religious expression.

116.    These special disabilities apply only to religious speech and exercise and to no other employee speech.

117.    Defendants' COVID-19 Policies, practices and customs cannot be justified by a compelling governmental interest and are not narrowly tailored to advance any such interest.

118.    Defendants' COVID-19 Policies, practices, and customs chills Plaintiff's freedom of religious exercise, which is a fundamental right guaranteed to Plaintiff by the First Amendment.

119.    Defendants' COVID-19 Policies, practices, and customs of prohibiting Plaintiff from engaging in religious activities and expressions during the Pandemic violates the Free Exercise Clause of the First Amendment to the United States Constitution, as incorporated and applied to Defendants under the Fourteenth Amendment.

WHEREFORE, Plaintiff respectfully prays that the Court grant the relief set forth hereinafter in the Prayer for Relief.

## COUNT 6
## VIOLATION OF THE EQUAL PROTECTION CLAUSE OF THE FOURTEENTH AMENDMENT
### *All Defendants*

120.   Plaintiff incorporates herein the previous averments as if fully set forth.

121.   The Equal Protection Clause of the Fourteenth Amendment requires that the government treat similarly situated persons alike.

122.   Pursuant to its COVID-19 Policies, practices and customs, Defendants allowed all employees to seek religious exemptions or accommodations to vaccines, testing and masking.

123.   But Defendants denied Plaintiff the ability to communicate his religious expression simply because of the religious content and viewpoints of his speech.

124.   By discriminating against the religious content and viewpoint of Plaintiff's speech, Defendants treated Plaintiff differently than other similarly situated employees on the basis of his religion, a protected classification.

125.   Defendants' COVID-19 Policies, practices and customs violated various fundamental rights of Plaintiff, including his rights to freedom of speech and the free exercise of religion.

126.   When government regulations, like PSU's COVID-19 Policies, practices, and customs, challenged herein, infringe on such fundamental rights, discriminatory intent is presumed.

127.    Defendants' COVID-19 Policies, practices and customs has also been applied to intentionally discriminate against Plaintiff's rights of free speech and free exercise of religion.

128.    Defendants lack a rational or compelling state interest for such disparate treatment of Plaintiff.

129.    Defendants' discrimination against Plaintiff is not narrowly tailored to serve a compelling state interest.

130.    Accordingly, Defendants' COVID-19 Policies, practices, and customs of prohibiting Plaintiff from discussing matters solely because of the religious nature of his speech violates Plaintiff's right to the equal protection of the laws as guaranteed by the Fourteenth Amendment to the United States Constitution.

WHEREFORE, Plaintiff respectfully prays that the Court grant the relief set forth hereinafter in the Prayer for Relief.

## COUNT 7
## VIOLATION OF THE DUE PROCESS CLAUSE OF THE
## FOURTEENTH AMENDMENT
## (SPEECH and RELIGIOUS EXPRESSION)
### *All Defendants*

131.    Plaintiff incorporates herein the previous averments as if fully set forth.

132.    The Due Process Clause of the Fourteenth Amendment prohibits the government from censoring speech pursuant to vague standards that grant unbridled discretion.

133.   The arbitrary determination by PSU officials including Ms. Hnatkovich and Dr. Edmondson of what is and is not forbidden speech violates this norm.

134.   Employees, such as the Plaintiff, of common intelligence must therefore guess as to whether his or their expression will be of the type that PSU officials ban at PSU Campuses—including "religious" expression.

135.   Defendants' COVID-19 Policies, practices and customs are vague and allow for unbridled discretion in determining which employee's speech satisfies its ban against "religious" expression.

136.   Defendants' COVID-19 Policies, practices and customs allow PSU officials like Defendants Ms. Hnatkovich and Dr. Edomndson to act with complete unbridled discretion when deciding if expression that Plaintiff desired to engage in during the Pandemic is prohibited.

137.   The discretion given to PSU officials pursuant to Defendants' COVID-19 Policies, practices, and customs leaves censorship of Plaintiff's speech to the whim of PSU officials.

138.   Indeed, this is evidenced by the fact that Plaintiff was permitted to express his faith on PSU campuses in prior years before the Pandemic but was abruptly banned by Defendants shortly after the start of the 2021 school year during the Pandemic.

139.    Defendants' COVID-19 Policies, practices and customs accordingly violate Plaintiff's rights under the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

WHEREFORE, Plaintiff respectfully prays that the Court grant the relief set forth hereinafter in the Prayer for Relief.

**COUNT 8**
**VIOLATION OF THE ESTABLISHMENT CLAUSE OF THE FIRST AMENDMENT**
***All Defendants***

140.    Plaintiff incorporates herein the previous averments as if fully set forth.

141.    Defendants' COVID-19 Policies, practices and customs embody hostility toward religious expression and require excessive entanglement with religion, both forbidden under the First Amendment's Establishment Clause, incorporated, and made applicable to the states by the Fourteenth Amendment to the United States Constitution.

142.    Defendants' COVID-19 Policies, practices and customs of banning Plaintiff's religious expression evinces discriminatory suppression of private speech that is not neutral, but rather is hostile toward religion.

143.    Defendants, pursuant to their COVID-19 Policies, practices, and customs of suppressing private religious expression, send the message to employees like the Plaintiff that religious speakers such as Plaintiff are second-class citizens, outsiders, and not full members of the PSU community.

144.   Defendants send the message that Christian employees like the Plaintiff are outsiders by excluding religious points of view and expression during the Pandemic while concurrently permitting all other points of view and expression by faculty, employees, and students.

145.   Defendants' COVID-19 Policies, practices and customs compel PSU officials like Ms. Hnatkovich and Dr. Edmondson to classify private religious or even political speech according to its perceived religious-versus-nonreligious, political versus non-political nature.

146.   Drawing this distinction necessarily requires PSU officials to inquire into the significance of words and practices to different religious faiths and different political persuasions.

147.   Such inquiries by PSU officials excessively entangle them with religion and politics in a manner forbidden by the First Amendment.

148.   Entanglement problems exist because PSU officials must attempt to discern which private employee expression is too "religious" in nature or too "political" in nature to be permitted during the Pandemic.

149.   PSU officials must make theological interpretations in order to conclude that some employee speech is "religious," while other employee speech is not.

150.   PSU officials must make political evaluations in order to conclude that some employee speech in "political" while other employee speech is not.

151.   PSU officials including Ms. Hnatkovich and Dr. Edmondson denied Plaintiff the right to engage in private, religious expression or political speech during the Pandemic, an action that represents the antithesis of neutrality.

152.   No compelling state interest exists to justify the censorship of Plaintiff's private religious expression or political expression.

153.   Defendants' COVID-19 Policies, practices and customs therefore violate the Establishment Clause of the First Amendment to the United States Constitution, as incorporated and applied to Defendants under the Fourteenth Amendment.

WHEREFORE, Plaintiff respectfully prays that the Court grant the relief set forth hereinafter in the Prayer for Relief.

**COUNT 9**
**42 U.S.C. §1983 – DEPRIVATION OF DUE PROCESS RIGHTS**
**SUBSTANTIVE DUE PROCESS – RIGHT TO PRIVACY**
***All Defendants***

154.   Plaintiff incorporates herein the previous averments as if fully set forth.

155.   At all times relevant hereto, the Plaintiff was a public sector employee of the Defendants herein and is a citizen of the United States of America and a resident of the Commonwealth of Pennsylvania.

156.   The Plaintiff is also a public sector employee within the meaning, purview, and protections of the Fourteenth Amendment to the United States Constitution.

157.   At all times relevant hereto, Defendant PSU is a governmental unit within the meaning and purview of 42 U.S.C. § 1983.

158.   Defendants' including Defendants Ms. Hnatkovich and Dr. Edmondson, individually and collectively, deprived the Plaintiff of his right to privacy and consequently denying him due process rights when it required COVID-19 testing which included genetic information through saliva and/or nasal swab testing which included private medical DNA, as more fully described above, and when doing so caused the Plaintiff's DNA to be used for research without his informed consent.

159.   Due to PSU's and Defendants' Ms. Hnatkovich and Dr. Edmondson's unlawful discipline, bullying, failure to notice, and unauthorized and unlawful seizures, PSU's and Defendants' Ms. Hnatkovich and Dr. Edmondson's deprived Plaintiff of his civil rights protected under the Fourteenth Amendment, and deprivation of which is a cognizable action under 42 U.S.C. §1983.

160.   At the time of the Defendants' actions, a reasonable public official knew or should have known that the bullying, harassment, failure to notice, and discipline were retaliatory actions and violated the Plaintiff's established privacy rights.

161.   In its denial of the meaningful, recognized full panoply of due process, PSU and the Individual Defendants have caused Plaintiff to suffer a deprivation of procedural and/or substantive due process rights afforded him by the Fourteenth Amendment of the United States Constitution, the deprivation of which is a cognizable action under Section 1983, 42 U.S.C. § 1983.

162.   As a result of the actions or inaction taken by PSU and the Individual Defendants, including the failure to interact regarding requested workplace accommodations failure to properly train supervisors about its policies, the Defendants' have individually and collectively caused Plaintiff to suffer damages, losses, and other harms.

WHEREFORE, Plaintiff demands judgment in his favor to the fullest extent of the law for his damages and as more fully noted below in his prayer for relief.

## COUNT 10
## GENETIC INFORMATION NONDISCRIMINATION ACT
### *PSU Only*

163.   Plaintiff incorporates herein the previous averments as if fully set forth.

164.   More than thirty days prior to the institution of this lawsuit, Plaintiff filed a charge with the EEOC alleging violations of GINA, and Title VII, by Defendants. All conditions precedent to the institution of this lawsuit have been fulfilled.

165.   Since at least July 2021, Defendants have engaged in a pattern or practice of employment practices made unlawful by GINA. Specifically, PSU requests genetic information through COVID-19 testing which is clearly used not as a diagnostic tool but for research purposes (see Exhibit A) from unvaccinated and those who have not shared their vaccination status, in violation of, but not limited to, Sections 201(3), 201(4), and 202(b) of GINA, 42 U.S.C. §2000ff (3), §2000ff (4), and §2000ff-1(b).

166.   As more fully described in detail above, Defendants engaged the Plaintiff in DNA testing without his informed consent.

167.   Since at least July 2021, PSU failed, in violation of Section 207(a) of GINA, 42 U.S.C. § 2000ff-6(a), which incorporates by reference Section 711 of Title VII, 42 U.S.C. §2000e-10, to post and keep posted notices that have been prepared or approved by the EEOC setting forth excerpts from or summaries of the pertinent provisions of GINA and information pertinent to the filing of a charge or complaint.

168.   Since at least June 2021, PSU failed, in violation of Section 709(c) of Title VII, 42 U.S.C. §2000e-8(c) and 29 C.F.R. §1602.12, to create, maintain, and file EEO-1 reports.

169.   The effect of the practices complained of above has been to deprive the Plaintiff of equal employment opportunities and otherwise adversely affect his status as an employee because of genetic information.

170.   The effect of the practices complained above has been to deprive the Plaintiff of equal employment opportunities and otherwise adversely affect his status as an employee because of status as an unvaccinated employee.

171.   The effect of the practices complained of above has been to deprive the Plaintiff of equal employment opportunities and otherwise adversely affect his status as an employee participating in lack of informed consent DNA testing.

172.  The effect of the practices complained of above has been to inflict emotional pain, suffering, and inconvenience upon the Plaintiff who provided genetic information to PSU and other third parties without informed consent.

173.  The unlawful employment practices complained of above were intentional.

174.  The unlawful employment practices complained of above were done with malice and reckless disregard for the federally protected rights.

**COUNT 11**
**FOURTH AMENDMENT ILLEGAL SEARCH AND SEIZURE**
**42 U.S.C. § 1983**
***All Defendants***

175.  Plaintiff incorporates herein the previous averments as if fully set forth.

176.  The Fourth Amendment states: "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated ...." Further, "[t]he Amendment guarantees the privacy, dignity, and security of persons against certain arbitrary and invasive acts by officers of the Government [.]" *Skinner v. Railway Labor Executives' Assn.*, 489 U.S. 602, 613–614, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989).

177.  Defendants, as more fully named above, and based upon its illegal policies, practices and/or customs, or lack thereof, individually and collectively, acted and/or validated the action(s) of, and intentionally intruded upon the Plaintiff's privacy in that they searched and seized his genetic information and/or DNA

without his informed consent and permitted, *inter alia*, his personal DNA to be given to third parties for research without his consent and without justification.

178.  The Plaintiff had a subjectively and objectively reasonable and legitimate expectation of privacy in his DNA.

179.  A reasonable person would find the intentional, malicious, and willful intrusion into the Plaintiff's DNA to be highly offensive and/or morally reprehensible to any reasonable person.

180.  The Defendants had no justification for seizing and/or distributing the Plaintiff's DNA without his consent.

181.  In this regard the Defendants were intentionally or deliberately indifferent to the Plaintiff's privacy rights.

182.  Further, Plaintiff did not and could not have consented to such a search and seizure on the part of the Defendants since he was not made aware of his right to choose not to capitulate to the search, seizure and/or disclosures of his DNA as he had no knowledge of the use of his DNA for third-party research only purposes, therefore any search, seizure or disclosures were involuntary.

183.  Additionally, Plaintiff was forced to endure embarrassment and was placed under threat, explicit or implied, of termination.

WHEREFORE, Plaintiff has suffered damages and demands judgment in his favor to the fullest extent of the law and as per his prayer for relief below.

## COUNT 12 - LOSS OF CONSORTIUM – *All Defendants*

184.   Plaintiff incorporates herein the previous averments as if fully set forth.

185.   At the time of the actions of PSU complained of in the Plaintiffs' Complaint, the Plaintiffs were married. Plaintiffs continue to be married.

186.   That as a result of the wrongful acts of the Defendants, and each of them, the Plaintiffs were caused to suffer, and will continue to suffer in the future, loss of consortium, loss of society, affection, assistance, and conjugal fellowship, all to the detriment of their marital relationship.

187.   That all the injuries and damages were caused solely and proximately by the actions of the Defendants.

WHEREFORE, the Plaintiffs jointly as husband and wife, demand judgment against the Defendants, jointly and severally, as per the Prayer for Relief below, plus costs, pre-judgment interest, post-judgment interest, and any other costs this court deems appropriate.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs prays that this Court:

(a)      Declare PSU violated Title VII by failing to engage in the interactive process in response to Plaintiff's request for accommodations to its Policy and, instead, preemptively denying his request based on pretextual reasons.

(b)    Declare PSU violated Title VII for its failure to provide a reasonable accommodation and disparately treated Plaintiff to his clearly articulated religious beliefs when numerous no-cost options were available.

(c)    Declare that PSU violated Title VII by retaliating against Plaintiff for engaging in protected activity through seeking religious accommodation.

(d)    Award Plaintiff damages, including back pay, front pay, pre-judgment and post-judgment interest, punitive damages, and compensatory damages and other affirmative relief necessary to eradicate the effects of PSU' unlawful employment practices.

(e)    Award Plaintiff damages necessary to make him whole by providing compensation for past and future pecuniary losses resulting from the unlawful employment practices described above, including emotional pain, suffering, inconvenience, loss of enjoyment of life, humiliation, and loss of civil rights, in an amount to be determined at trial.

(f)    Award Plaintiff Hilary Homer damages for loss of consortium as derived from the claims of her husband and for pain and suffering caused by PSU as more fully outlined above.

(g)      Award reasonable attorney fees and costs; and

(h)      Award such other and further relief that this Court may deem just

and equitable.

## DEMAND FOR JURY TRIAL

Plaintiff hereby respectfully demands trial by jury on all counts so triable.

DATED this the 4th day of November 2022.

> *By: /s/ Jeremy A. Donham, Esquire*
> Jeremy Donham (206980)
> **DONHAM LAW**
> 714 Venture Drive, Ste. 144
> Morgantown, West Virginia 26508
> (717) 881-7855 (phone)
> Email: J.Donham@Donhamlaw.com
>
> Steven Rinehart (Pro Hac Vice Pending)
> **VESTED LAW, LLP**
> 110 S. Regent Street, Suite 200
> Salt Lake City, UT 84111
> (801) 456-9728 (Phone)
> Email: steve@utahpatentattorneys.com
>
> Charles J. Hobbs (209321)
> (Pro Hac Vice Pending)
> **THE HOBBS LAW FIRM**
> 256 E. Market Street
> York, PA 17403
> (717) 793-2398 (Phone)
> Email: chobbs@thehobbslawfirm.com