## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ADAM M. HOMER<br><br>Plaintiff,<br><br>vs.<br><br>THE PENNSYLVANIA STATE UNIVERSITY, MELISSA HNATKOVICH, INDIVIDUAL, JACQUELINE EDMONDSON, Ph.D., INDIVIDUAL<br><br>Defendants. | Case No. 22-cv-1570<br><br>Hon. Maureen P. Kelly |

## AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

Adam M. Homer ("Mr. Homer" or "Plaintiff") moves the Court for entry of judgment in their favor against the named Defendants and in support of such Complaint avers as follows:

### PARTIES, JURISDICTION AND VENUE

1. This Honorable Court has jurisdiction pursuant to 28 U.S.C. §1331 as this case arises under and pursuant to federal law specifically; 42 U.S.C. §1983 Deprivation of Due Process Rights and under the Fourth Amendment to the United States Constitution, the Genetic Information Nondiscrimination Act

("GINA") and Title VII (Religion). Moreover, this Honorable Court has jurisdiction over Plaintiff's state law claims to the extent that he pleads them pursuant to 28 U.S.C. §1367.

2.    Venue lies within the Western District of Pennsylvania pursuant to 28 U.S.C. §1391(b) (2) as the facts and occurrences, acts and/or omissions, and incidents and/or actions alleged herein took place within this judicial district.

3.    Plaintiffs bring this action against Mr. Homer's former employer, The Pennsylvania State University, ("Defendant" or "PSU"). PSU is a Pennsylvania Educational Institution principally located for this case at 4000 University Drive, McKeesport, PA 15132.

4.    Defendant Melissa Hnatkovich ("Ms. Hnatkovich") is an adult female and upon information and belief, resides within in the Commonwealth of Pennsylvania. Ms. Hnatkovich was formerly employed by PSU as Regional Human Resources Strategic Partner (she is now employed at Carnegie Mellon University, as of March 2022, as HR Business Partner). Ms. Hnatkovich was in the supervisory line of succession relative to the Plaintiff and participated in the decisions to enforce discipline and/or to terminate employees including the Plaintiff.

5.    Defendant Jacqueline Edmondson ("Dr. Edmondson") is an adult female and upon information and belief, during the operative time, formerly resided within in the Commonwealth of Pennsylvania. Dr. Edmondson was employed by PSU as

Chancellor and Chief Academic Officer (as of June 2022 she is the President of the University of Southern Maine). Dr. Edmondson was in the supervisory line of succession relative to the Plaintiff and participated in the decisions to enforce discipline and/or to terminate employees including the Plaintiff.

6.   Defendant PSU is a recipient of federal financial assistance through, *inter alia*, funded programs sponsored by, *inter alia*, the American Recovery and Reinvestment Act of 2009, other Federal Stimulus funds, Research funding, Higher Education Emergency Relief Fund ("HEERF"), and federal resources from which the U.S. Department of Education advises PSU to use the money for additional nonrecurring expenses like purchasing equipment, teaching resources like books, and software.

7.   Mr. Homer is an adult male who, at all relevant times hereto, resides in the Commonwealth of Pennsylvania.

## UNDERLYING FACTS

8.   Mr. Homer commenced employment with PSU on January 15, 2018. He held the position of Facilities Manager and was later promoted to Physical Plant Manager and Facilities Manager.

9.   Mr. Homer is a practicing, Christian. Pursuant to his sincerely held religious beliefs, Mr. Homer sought accommodations with regard to COVID-19 Vaccine Requirements, masking and testing protocols.

10. At all times, Mr. Homer performed all duties as "above expectations" at PSU and was never substantively disciplined while employed with PSU.

11. In April and May of 2020 masks were not required at PSU as the CDC and Anthony Fauci, Pandemic Czar under President Donald J. Trump, had reported masks were not effective in stopping the transmission of the COVID-19 virus.

12. At this time there were many essential personnel still working on the campus that were requesting masks as they wanted to wear them and were not able to find any in local stores.

13. PSU was not requiring masks and were not providing them to employees at that time. This notwithstanding, as a maintenance safety official for the university, the Plaintiff and his mother made masks for students and employees as there had not been enough masks to go around on campus. Together, they made masks for faculty, staff, and students that were continuing to be present on campus during the initial closure phases of the Pandemic.

14. In August of 2020 PSU and the CDC changed their stance on masks and PSU initiated the "Mask-up or Pack-up" requirement for all non-union staff, faculty, and students. This policy would later be changed on multiple occasions, and as of late July/early August of 2021 masks were only required for unvaccinated, non-union workers who did not provide their vaccination status to PSU.

15. It is important to note that, masking was still not a requirement of Union Employees (of whom Plaintiff was the direct supervising manager and that at many points in the policy changes, Plaintiff was the only person in his shop required to follow masking and testing, and later vaccination requirements).

16. Union employees were not required to follow the COVID-19 policies which Plaintiff was seeking accommodation for, based upon his religious beliefs.

17. However, as more fully noted within, and below, PSU would not address Plaintiff's accommodation requests, mocked him, harassed him, threatened write-ups, discipline and termination and made Plaintiff out to be a horrible person, non-Christian, a liar and a pariah for seeking accommodations.

18. Specifically, on or about June 5, 2021, PSU lifted a mask mandate which was implemented after June 28, 2021.

19. PSU offered an additional eight (8) hours of sick time for employees who received the vaccine, but sick pay was not offered to un-vaccinated employees (See Exhibit A)

20. On June 10, 2021, Ms. Hnatovich sent an email to Plaintiff stating that up until June 28, 2021, he could require proof of vaccination for any tech service employees not wearing masks, but that proof must be submitted to HR, not the supervisor. She went on to state that "You do not HAVE to require, but you can choose to if you wish." She also went on to state in the email that union

employees will not be required to wear masks after June 28, 2021, regardless of their vaccine status (see Exhibit B and see Town Hall meeting where Lorraine Goffe, Vice President of Human Resources said this was forbidden. https://www.youtube.com/watch?v=iSFRN1AwYv8 – see 45.35 for Ms. Goffe's discussion during an August 3, 2021, Town Hall held by PSU).

21. On or about July 15, 2021, PSU began eliminating signage regarding "Mask Up or Pack Up" masking requirements and moved to a policy that all individuals were required to wear face masks when inside buildings on its campuses. However, as previously stated, during the 2021 calendar year, Union employees were not required to follow any university protocols, (see Exhibit C)

22. As the Physical Plant Manager, Plaintiff was the only person in his building required to wear a mask due to his non-union status. All other employees did not mask, test, or report any information related to vaccination status.

23. In early August 2021, the requirement to DNA test and to mask was placed on all employees who did not share their vaccination status or get vaccinated. The only population that was not included under this directive from PSU was Union Employees, of which Plaintiff was responsible for the direct management and supervision of 14 Union Employees. Thus, the Defendants illegally required Plaintiff's DNA from Buccal (saliva) swab samples and illegally disclosed it to Spectrum Solutions (DNA) (see Exhibit D).

24. In the fall of 2021, PSU instituted a policy that all students and faculty who had not been vaccinated or had not "…shared with PSU that they have been vaccinated" would be required to be tested for COVID-19. However, as of the fall of 2021, there was no PSU requirement for COVID-19 vaccines.

25. Further, PSU instituted a policy that individuals with religious beliefs could seek accommodations from policies as to vaccines, testing or masking.

26. In 2021 and 2022, PSU, however, and its agents, including Ms. Hnatkovich and Dr. Edmondson, began a policy of segregating unvaccinated employees and employees who sought religious exemptions, as more fully described above. In fact, PSU tacitly approved of a policy of failing to interact in good faith regarding religious accommodation and exemption requests.

27. Further, in 2021 and 2022, PSU and its agents, including Ms. Hnatkovich and Dr. Edmondson, engaged in efforts to quell religious accommodation requests.

28. Specifically, on or about July 26-28, 2021, Mr. Homer had a verbal discussion with Ms. Hnatkovich focused on his religious beliefs and requests for accommodations associated with the Masking Mandate and DNA Testing. The Vaccine was not a requirement at that time. In the meetings, Ms. Hnatkovich, after Plaintiff raised his desire to explore religious exemptions, questioned Plaintiff about his religion, mocked his beliefs, claimed that it was "politics" and

stated that he was "not in a protected class." Ms. Hnatkovich also stated to Plaintiff that "he was not a Christian" and that she would be writing him up.

29. This was the beginning of the end for Plaintiff's career with PSU as the actions of Ms. Hnatkovich chilled Plaintiff's religious accommodation inquiries and began the downward trend of viewing the Plaintiff as a religious fanatic to isolate and ostracize him and eventually remove him from his job paying over $94,000 per year. The Plaintiff verbally, and in writing, opposed the treatment and retaliatory animus by the named defendants (see Exhibit E).

30. On July 26, 2021, in the same email wherein she discussed seeking accommodation for religious and/or disability related reasons, Ms. Hnatovich chose to include threats of termination for noncompliance of masking and vaccine policies.

31. On or about July 28, 2021, Ms. Hnatkovich wrote up the Plaintiff for alleged non-compliance with masking protocols despite the fact that during this time, Plaintiff was being provided accommodations from his then, current direct supervisor, Dave DeNardo, regarding masking. Mr. DeNardo and Plaintiff discussed, on a weekly basis, that there were times that he would ask Plaintiff to wear a mask in larger public meetings or settings. However, the masking policy was not enforced on a regular basis. Plaintiff attended meetings with both Mr. DeNardo and Dr. Edmondson where no one wore a mask.

32. On July 29, 2022, Ms. Hnatovich suggested Plaintiff bring his vaccination card to her personally and she would review it for compliance. This, despite the policy against requesting proof of vaccine from employees (see Exhibit B and see Town Hall meeting where Lorraine Goffe, Vice President of Human Resources said this was forbidden. https://www.youtube.com/watch?v=iSFRN1AwYv8 - see 45.35 for Ms. Goffe's discussion during an August 3, 2021, Town Hall held by PSU).

33. Further, on September 15, 2021, Ms. Hnatkovich wrote up Plaintiff once again for allegedly lying about his vaccine status and his activities prior to quarantine in an effort, again, to chill Plaintiff's attempts to seek religious exemptions. Once more, Plaintiff was then told if he chose not to be vaccinated, he would be sent to a re-education program until he learned to comply (see Exhibit E).

34. Then, yet again, Ms. Hnatkovich wrote up the Plaintiff for being one-day late in getting a COVID-19 test (DNA test) even though he explained that he was doing multiple tasks since Mr. DeNardo had left, and he was trying to keep up with his responsibilities and those of many others, without extra pay. Importantly, Plaintiff was taking a coerced DNA test at this time because it was made clear to him that he would lose his job if he did not comply. However, no one was addressing Plaintiff's repeated requests for religious accommodations except Mr. DeNardo, who had told the Plaintiff that he would not ask him to wear a mask but then he left to accept another position elsewhere.

35. The Plaintiff was required to be tested using his saliva which contains his genetic markers. This was compulsory, not voluntary, because employees were not told that the company handling the testing was seeking DNA for research purposes only, (see Exhibit D).

36. Furthermore, and critically, neither Ms. Hnatkovich nor any other agent of PSU ever investigated whether the Plaintiff could be accommodated when it would have been reasonably simple to have acknowledged the information Plaintiff had provided the defendants and made a decision as to whether Plaintiff's religious beliefs could be accommodation. In his termination appeal, Brian Naviglia, Affirmative Action Specialist Penn State University, acknowledged receipt of Plaintiff accommodation requests in October and December 2021, and information Plaintiff provided but claims he was still waiting on more information.

37. Instead, of accommodating the Plaintiff, however, he was harassed and demeaned for seeking accommodations. Once more, at no time did Ms. Hnatkovich or Dr. Edmondson investigate the Plaintiff's opposition to what he perceived to be retaliation for expressing his beliefs in the context of an accommodation request (see Exhibit E).

38. Further, Ms. Hnatovich requested Plaintiff's vaccination card although Ms. Goffe,            said            this            was            forbidden.

https://www.youtube.com/watch?v=iSFRN1AwYv8 – see 45.35 for Ms. Goffe's

discussion during an August 3, 2021, Town Hall held by PSU.

39.  In fact, during a Labor Relations ("LR") proceeding, LR representatives and

Human Resources allowed Plaintiff to be bullied, allowing yelling and slanderous

accusations to be made against Plaintiff. Plaintiff's supervisor, Mr. DeNardo,

verbalized and sent emails to Ms. Hnatkovich on and about July and August 2021

regarding Plaintiff and the way he was being mistreated, yet nothing was ever

done to prevent or remedy the treatment, even though Dr. Edmondson herself

agreed that the "bullying tactics" needed to be addressed (see Exhibit E).

40. Later in August 2021, mask mandates were applied but changed repeatedly

during the fall of 2021. Further, testing was enforced, but individuals who had

taken the Covid-19 Vaccines were not required to be tested. Many were required

to give saliva samples for DNA testing or be disciplined and lose their jobs. Once

more, at no time did the defendants ever disclose to the Plaintiff or anyone else

that the testing conducted was DNA testing being used for research purposes.

41. Further, Plaintiff opposed the lack of transparency and lack of informed consent

to the testing even raising the Genetic Information Nondiscrimination Act and

his privacy being invaded (see Exhibit D & E).

42. Plaintiff was later terminated due to the information from his genetic tests.

43. Furthermore, Plaintiff was terminated due to his persistent requests to, *inter alia*, be accommodated and permitted to test for COVID-19 from home through self-tests, seek remote work from home as he had previously been permitted to do due to his worker's compensation injury, or come into the facility at earlier or later hours when other employees would not be present.

44. Furthermore, as an employee, the Plaintiff felt he had every right to prevent his genetic information (i.e., his saliva sample – DNA) from being genetically tested and then disclosed to PSU and a third party, Spectrum DNA, for research. In *Leone v. North Jersey Ortho Specialists, P.A*., Civil Action No. 11-3957 (ES) 2012 WL 1535198 *5 (D. New Jersey Apr. 27, 2012) the Leone Court states that GINA Section 2000ff (4) (A) defines "genetic information" as "information about—(i) *such individual's genetic tests*, (ii) the genetic tests of family members of such individual, and (iii) the manifestation of a disease or disorder in family members of such individual." We therefore "review the complaint to determine whether Plaintiff has pleaded and plausibly supported, *at least*, (1) that she was an employee; (2) who was discharged or deprived of employment opportunities; (3) because of information from Plaintiff's genetic tests.". *Carroll v. Comprehensive Women's Health Servs*., No. 3:16cv1509, 15-16 (M.D. Pa. Sep. 27, 2017) (emphasis added).

45. On October 14, 2021, Plaintiff filed an online application with the Equal Employment Opportunity Commission ("EEOC") as well as with PSU attesting that he had been discriminated against due to religion, creed, and genetic information. This Charge was docketed as 530-2022-00678, and dually filed with the Pennsylvania Human Relations Commission ("PHRC") and included averments covering discrimination and retaliation on the basis of seeking an exemption regarding COVID-19 vaccinations, masking and DNA testing as Plaintiff felt that since he had sought accommodations for the vaccine, masking and testing and was denied and harassed, so he sought to protect his rights.

46.  Plaintiff was perplexed as to why his beliefs would not be taken seriously. As he had sought out assistance with Mr. DeNardo, his supervisor, who was open to some limited interaction, but PSU took no action to interact in good faith and after Mr. DeNardo left, Plaintiff had no one to support his requests including Mr. Naviglia or the Affirmative Action Office.

47. At this time of the Pandemic Response, as per the CDC, local and PSU policies regarding vaccines and even masking was in flux, changing on a regular basis. Additionally, as previously noted, Mr. DeNardo, was planning to leave in August 2021 for Sewickley Academy. Mr. DeNardo attempted to work with the Plaintiff regarding his accommodation requests and was, in fact, offering him accommodations prior to leaving such as telling him he would not ask that he be

masked. Again, the inconsistent messages received from PSU and its agents left the Plaintiff confused and discouraged. Thereafter, PSU's action and inaction began to create stress and anxiety for his family.

48.   On December 15, 2021, Plaintiff wrote, yet again, to the Affirmative Action Office at PSU seeking accommodations for the COVID-19 vaccine, testing and masking. There were many accommodations as noted above, that could have been provided such as coming in early to do inspections or staying late when he would not have been around others, or zoom, and/or using Teams to have meetings when necessary. The only people he was around were Union employees that, as previously stated, did not need to follow PSU's COVID policies (See Exhibit C & E).

49.   On January 6, 2022, Plaintiff sent yet another letter to the Affirmative Action Office at PSU reporting that he had, first, made multiple attempts to seek accommodations for his religious beliefs which were then chilled by Ms. Hnatkovich who took it upon herself to opine in initial meetings that the Plaintiff has no religious beliefs, that he was a liar, that he was expressing political positions and beliefs, and if he did not conform to taking vaccines he would be sent to a re-education program.

50. Next, that Plaintiff had still received no interaction about the accommodation requests for DNA testing or masking (as he had been on the PSU rollercoaster

during the Pandemic that allowed people to go maskless (as they did during the first part of the Pandemic) and then require masking, only to be told not long after that masking was no longer required. The inconsistencies at PSU were puzzling and incoherent throughout the Pandemic.

51. Next, the Plaintiff expressed that he had been given no guidance on whether the COVID-19 testing (which was only required of unvaccinated or among those that had not shared their vaccine status) was in fact taking the genetic make-up of individuals in an effort to identify a certain segment of the population and their COVID-19 health status while blatantly using the testing for research processes against the will of employees and students and without their informed consent.

52. Finally, he stated that he was being harassed, ostracized, had filed an EEOC charge, and still had not been given an answer regarding his numerous attempts to seek interaction. Additionally, and critically, that Plaintiff and his family was experiencing health concerns due to the increased level of stress from the continuous attacks, harassment, and the hostile working conditions.

53. The EEOC Charges had been served upon PSU prior to January 3, 2022. Plaintiff initially filed his first Charge on or about October 14, 2021, and subsequently, filed a dually filed Charge with the EEOC and the PHRC on January 3, 2022, docketed as 530-2022-00116.

54. On January 10, 2022, Defendants met with Plaintiff and Ms. Hnatkovich and Dr. Edmondson terminated the Plaintiff without any investigation into any of his accommodation requests or harassment allegation due to their disdain for people of faith and individuals seeking accommodations based on their faith.

55. Both of Plaintiff's Charges were dismissed with a right to sue on August 18, 2022 (see Exhibit F). All administrative remedies have been exhausted pursuant to Title VII as filed herein. The Plaintiff's Pennsylvania Human Relations Act ("PHRA") claims are also fully exhausted having reached the one (1) year mark after filing as of January 3, 2022.

56. Plaintiff sought an appeal from his termination and explained, yet again that he had sought accommodations, but the accommodation requests had not been responded to prior to the termination. Mr. Naviglia stated Plaintiff had sought accommodations and that he was waiting on more information from Plaintiff before he could respond but Plaintiff stated he had already provided him with sufficient information from which to make a decision. https://psu.mediaspace.kaltura.com/media/Staff+Grievance+Hearing/1_dd8g1v 67 Within days of Plaintiff's March 2022 appeal, masking policies were eliminated by PSU.

57. The Defendants' actions or inaction are of a continuing nature; thus, they fall under the doctrine of a continuing violation theory.

58.     Once more, PSU is responsible/liable for the actions of its agents under a

theory of *Respondeat Superior.*

### *RELIGIOUS DISCRIMINATION - REASONABLE ACCOMODATION OPTIONS UNJUSTIFIABLY REJECTED BY PSU*

59. PSU could have accommodated Plaintiff's sincere religious beliefs without

undue hardship (indeed, with little cost by allowing Plaintiff to work from home

as in previous times, zoom or use MS Teams for meetings, to come to work at

less busy periods to avoid contact with others and/or to test himself with a home

test or any combination of the above). PSU failed to engage in the interactive

process to legitimately consider all possible accommodations. This caused PSU

to overlook accommodations posing less than a *de minimis* burden.

60. At the time of Plaintiff's termination, the CDC had conclusively stated that

individuals vaccinated for COVID-19 could nevertheless contract and spread

COVID-19. In fact, on March 29, 2021, the Director of the CDC Rochelle

Walensky publicly stated that the CDC's own data "suggests, you know, that

vaccinated people do not carry the virus, don't get sick, and that it's not just in

the clinical trials but it's also in real world data."[1] However, because the real-

world data already demonstrated breakthrough infections in the vaccinated just

---

[1] Statement from CDC Director Rochelle P. Walensky, MD, MPH on Rachel Maddow Show
(March 29, 2021), transcript available at: https://www.msnbc.com/transcripts/transcript-rachel-
maddow-show-3-29-21-
n1262442?utm_content=buffer7fb12&utm_medium=Arianna&utm_source=LinkedIn&utm_cam
paign=Buffer.

three months after the Pfizer-BioNTech vaccine received FDA approval, the CDC immediately thereafter clarified Director Walensky's statements and confirmed that vaccinated individuals do in fact become infected and spread the virus to others. *See* CDC Reverses Statement by Director, (April 2, 2021), available at: https://thehill.com/changingamerica/well-being/546234-cdc-reverses-statement-by-director-that-vaccinated-people-are-no/.

61. Before instituting its vaccination policy, PSU knew, or reasonably should have known that the vaccines were largely ineffective at controlling the spread of COVID-19. As early as July 2021, Director Walensky admitted that the vaccinated had similarly high viral loads of SARS-CoV-2 as the unvaccinated and thus could still contract and spread the Delta variant.[2]

62. Further, in August 2021, a joint study by CDC and the Wisconsin Department of Health services further confirmed Director Walensky's admission. The study indicated that vaccinated individuals had a 5% higher viral load than the unvaccinated and were not only just as likely to transmit the virus as the

---

[2] *Statement from CDC Director Rochelle P. Walensky, MD, MPH on Today's MMWR*, CDC News Room (July 30, 2021), available at https://www.cdc.gov/media/releases/2021/s0730-mmwr-covid-19.html [https://perma.cc/VR5V-E67A] ("Today, some of those data were published in CDC's Morbidity and Mortality Weekly Report (MMWR), demonstrating that Delta infection resulted in similarly high SARSCoV-2 viral loads in vaccinated and unvaccinated people. High viral loads suggest an increased risk of transmission and raised concern that, unlike with other variants, vaccinated people infected with Delta can transmit the virus.").

unvaccinated ***but posed a greater contagion risk due to the increased likelihood of asymptomatic infection***.[3]

63. Highlighting the irrationality of PSU's continued pursuit of enforcing its mandate against religious employees, PSU also refused to recognize natural immunity as satisfying its immunization requirement. This is despite the fact that the international scientific community had conclusively established through centuries of research that natural immunity is superior to vaccine-elicited immunity. *See Plotkin's Vaccines*, 7th Edition, at Section 2.

64. PSU is a sophisticated higher education university which focuses on medical and scientific educations and should have been aware of the fallacy of enforcing its vaccination policy in the context of undue hardship and failed to even consider the religious beliefs of Plaintiff when determining whether it could exempt him.

65. Recognizing Plaintiff's natural immunity to COVID-19 as an alternative to vaccination would have required no cost or action for PSU and would have imposed no logistical or administrative burden on PSU. It would have simply required that PSU acknowledge scientific reality.

66. Alternatively, allowing Plaintiff to work from home, to modify his schedule, to conduct zoom or Teams meetings, to self-test from home or a combination of the

---

[3] *See* Kasen Riemersma, et. al, *Shedding of Infectious SARS-CoV-2 Despite Vaccination, medRxiv* (August 24, 2021), available at:
https://www.medrxiv.org/content/10.1101/2021.07.31.21261387v4.full.pdf.

above would also have been a costless accommodation. As the CDC recognized in August of 2021, COVID-19 vaccines work "with regard to severe illness and death—they prevent it. But what they can't do anymore is prevent transmission."[4]

67. Because vaccinated individuals may also contract and transmit COVID-19, social distancing is a more reliable indication of safety from the virus than a vaccination at some earlier time. This fact was also well-known at the time PSU failed to accommodate Plaintiff and should have also been considered as a reasonable accommodation to the vaccine mandate.

### APPLICABLE LAW

68. Title VII and the PHRA prohibit PSU from discriminating against employees based on their religion. 42 U.S.C. § 2000e-2(a)(1). This "include[s] all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate an employee's . . . religious observance or practice without undue hardship on the conduct of the employer's business." 42 U.S.C. § 2000e(j).

69. In other words, an employer must "make reasonable accommodation for the religious observances of its employees, short of incurring an undue hardship." *Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 75 (1977). This allows a

---

[4] Statement by Rochelle Walensky, U.S. Centers for Disease Control, CNN Interview (Aug. 5, 2021),
available at https://www.cnn.com/2021/08/05/health/us-coronavirus-thursday/index.html.

plaintiff to raise claims of religious discrimination under both a disparate treatment theory and a failure-to-accommodate theory, *Chalmers v. Tulon Co. of Richmond*, 101 F.3d 1012, 1018 (4th Cir. 1996).

70. Failure to engage the interactive process to find a solution for an exempt employee "is not an independent violation of Title VII. But as a practical matter, such failure can have adverse legal consequences [because] where an employer has made no effort to act on an accommodation request, courts have found that the employer lacked the evidence needed to meet its burden of proof to establish that the plaintiff's proposed accommodation would actually have posed an undue hardship." EEOC Guidance, *Section 12: Religious Discrimination*, Part 12-IV.A.2 (citing *EEOC v. Ithaca Indus., Inc*., 849 F.2d 116, 118-19 (4th Cir. 1988) (finding that employer's failure to attempt to accommodate, absent any showing of undue hardship, violated Title VII)); *see also EEOC v. Arlington Transit Mix, Inc.*, 957 F.2d 219, 222 (6th Cir. 1991) ("After failing to pursue . . . any other reasonable accommodation, the company is in no position to argue that it was unable to accommodate reasonably [plaintiff's] religious needs without undue hardship on the conduct on its business.").

71. Title VII also prohibits Defendants from retaliating against an employee for engaging in protected activity. *Fogleman v. Mercy Hosp., Inc*., 283 F.3d 561, 571 (3d Cir. 2002) *see also, Moore v. City of Philadelphia*, 461 F.3d 331, 341-42 (3d

Cir. 2006) *Ferra v. Potter*, 324 F. App'x 189, 192 (3d Cir. 2009) ("As this Court has explained, '[w]ith respect to `protected activity,' the anti-retaliation provision of Title VII protects those who participate in certain Title VII proceedings . . . and those who oppose discrimination made un-lawful by Title VII. . . .'").

72. Furthermore, the decision not to interact with the Plaintiff regarding his religious beliefs in good faith but rather ostracize the Plaintiff, claim he is not a Christian, call him a liar, and hold him out to others as being a religious fanatic violates the sacrosanct expression of his beliefs and made him into a pariah.

73. Once more, the defendants continue, to this day, blackballing the Plaintiff in his work and future prospects for job positions by preventing him from working on any PSU jobs, even as an independent contractor, and by telling others he is not permitted to work for anyone associated with PSU. This has forced his current employer to refrain from bidding jobs for PSU.

## COUNT 1
## TITLE VII – RELIGIOUS DISCRIMINATION – FAILURE TO ACCOMMODATE
### (42U.S.C. § 2000e-2(a)(1))
### *Plaintiff v PSU ONLY*

74. Plaintiff incorporates herein the previous averments as if fully set forth.

75. An employee may assert a claim for his employer's failure to accommodate his sincere religious beliefs, so long as the accommodation does not impose undue

hardship on the employer. *See EEOC v. Consol Energy, Inc.*, 860 F.3d 131, 141 (4th Cir. 2017).

76. To establish a *prima facie* claim for failure to accommodate a plaintiff must present evidence that: "(1) he or she has a bona fide religious belief that conflicts with an employment requirement; (2) he or she informed the employer of this belief; and (3) he or she was disciplined for failure to comply with the conflicting employment requirement." *Id.* (quoting *EEOC v. Firestone Fibers & Textiles Co.*, 515 F.3d 307, 312 (4th Cir. 2008) (quoting *Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 75 (1977)).

77. Once the plaintiff has made out a prima facie case for discrimination, "the burden then shifts to the employer to show that it could not [reasonably] accommodate the plaintiff's religious needs without undue hardship." *Firestone Fibers*, 515 F.3d at 312 (quoting *Chalmers v. Tulon Co. of Richmond*, 101 F.3d 1012, 1019 (4th Cir. 1996).

78. Plaintiff clearly established his "bona fide religious belief" and its conflict with the Policy when he submitted his religious accommodation request to PSU. Because Plaintiff could not receive the COVID-19 vaccine without violating his religious beliefs, he could not comply with the Policy and was thus subject to adverse action through termination. While PSU may now attempt to challenge Plaintiff's beliefs, it is not the employer's place "to question the correctness or

even the plausibility of . . . religious understandings." *Consol Energy*, 860 F.3d at 142.

79. PSU provided no reasonable accommodations options to Plaintiff, nor did it engage in the interactive process to attempt to find a workable accommodation that would not pose an undue hardship to PSU. Even if not a standalone claim, the failure to engage in a meaningful interactive process signals an employer's violation of its duty to accommodate because the employer is attempting to remain purposefully ignorant of potential reasonable accommodations.

80. To establish the defense of "undue hardship," PSU must demonstrate that any of the aforesaid accommodations would "bear more than a *de minimis* cost" on the university. *Hardison*, 432 U.S. at 84. The above stated accommodations required no additional cost or logistical burden to PSU, as was seen when the university brought back and accommodated numerous employees from around the country who also held sincere religious beliefs that prevented them from taking the vaccine.

81. The ability to provide reasonable accommodations to employees such as Plaintiff is also evident by considering other entities including countless hospitals and even COVID-19 vaccine manufacturers such as Janssen (J&J)—that were able to accommodate employees with religious based objections to mandatory COVID-

19 vaccination policies. Defendant PSU is thus without excuse as to why it failed also to follow federal employment law in this regard.

82. Title VII requires an employer to thoroughly consider all possible reasonable accommodations and not just reject requests out of hand with form denials. "If the accommodation solution is not immediately apparent, the employer should discuss the request with the employee to determine what accommodations might be effective."[5]

83. Such accommodations might include things such as telework, zoom or Teams meetings and modifications in the schedule. In the face of the reasonable options proposed here, PSU cannot demonstrate even a *de minimis* burden in providing Plaintiff with a religious accommodation(s).

84. Further, in denying Plaintiff's request, PSU blankly asserted "significant undue hardship" and provided no justification as to why or how the several options he proposed (and were clearly available) were unable to be done without undue hardship. This is especially true where recognition of Plaintiff's natural immunity and/or continued telework or zoom/Teams meetings or modified scheduling (for example) required no cost, effort, or operational change to the status quo.

85. Moreover, PSU was on actual of notice of both the many possible accommodation options for Plaintiff and the fact that the failure to use one of

---

[5] EEOC Guidance Section 12: Religious Discrimination; Part IV, A.2.

them would result in a Title VII violation. Nonetheless, PSU forged forward with its campaign to eliminate its Christian employees, including Plaintiff.

86. Therefore, PSU unlawfully discriminated against Plaintiff based on his sincerely religious beliefs by failing to accommodate those beliefs. PSU cannot demonstrate that doing so would have imposed any hardship whatsoever, let alone undue hardship.

**COUNT 2**
**TITLE VII – RELIGIOUS DISCRIMINATION – DISPARATE TREATMENT – HOSTILE WORK ENVIRONMENT - RETALIATION**
(42U.S.C. § 2000e-2(a)(1))
***Plaintiff v PSU ONLY***

87. Plaintiff incorporates herein the previous averments as if fully set forth.

88. Title VII also makes it unlawful for "an employer to discriminate against any of [its] employees . . . because he has opposed any practice made unlawful by this subchapter." 42 U.S.C. § 2000e-3(a). 116. A prima facie case for retaliation requires a showing "that (1) she engaged in activity protected by Title VII; (2) that an adverse employment action was taken by the employer; and (3) that a causal link existed between the protected activity and the adverse action." *Roberts*, 998 F.3d at 122.

89. Here, Plaintiff engaged in protected activity under Title VII when he sought a religious accommodation from the Policy that would otherwise require him to violate his sincere religious beliefs. Then, because of his request for an accommodation, PSU subjected Plaintiff to its sham process in violation of

federal law. PSU never intended to accommodate Plaintiff. As a result, he was forced from his employment.

90. Were it not for Plaintiff's religious beliefs and his request for an accommodation, he would not have been subjected to such treatment.

91. Further, PSU hoped that the constant reminder of possible termination would result in Plaintiff abandoning his religious beliefs and surrendering to a coerced injection of a COVID-19 vaccine.

92. PSU' Policy forced those who were denied religious accommodations into a period of extreme emotional and psychological distress, seeking to coerce religious employees into compliance.

93. But for his request for religious accommodation, Plaintiff would not have experienced the psychological and emotional distress from the threat of termination where he was constantly pressured to violate his religious beliefs.

94. Separately, PSU refused to admit its mistake and accommodate the Plaintiff even after it became apparent that (1) accommodations were available; (2) the COVID-19 vaccines were not preventing contraction of the virus; and (3) individuals with natural immunity possessed superior immunity to those with the vaccine only. Such actions were due to Plaintiff's opposition to PSU' illegal employment law practice. PSU had made up its mind to purge as many unvaccinated religious

employees as it believed it could and the position against those seeking accommodations had become entrenched.

95. PSU's actions forced those denied accommodation into threats, cajoling and blatant harassment then on to terminate them after an arbitrary specified period of threats. This constitutes retaliation in violation of Title VII.

### COUNT 3
### TITLE VII – RETALIATION – OPPOSITION/PARTICIPATION CLAUSE
(42 U.S.C. §2000e-3(a))

### *Plaintiff v PSU ONLY*

96. Plaintiff incorporates herein the previous averments as if fully set forth.

97. Title VII also makes it unlawful for "an employer to discriminate against any of [its] employees . . . because he has opposed any practice made unlawful by this subchapter." 42 U.S.C. § 2000e-3(a).

98. A *prima facie* case for retaliation requires a showing "that (1) he engaged in activity protected by Title VII; (2) that an adverse employment action was taken by the employer; and (3) that a causal link existed between the protected activity and the adverse action." *Roberts*, 998 F.3d at 122.

99. Here, Plaintiff engaged in protected activity under Title VII when he sought a religious accommodation from the Policy that would otherwise require him to violate his sincere religious beliefs. PSU continued to oppose Plaintiff's unlawful practice through his termination.

100.  Then, because of his request for an accommodation, PSU subjected Plaintiff to its process to coerce him from exercising his rights under federal law. PSU Policy was not designed to look for a reasonable accommodation for Plaintiff because PSU never intended to accommodate Plaintiff. Were it not for Plaintiff's Christian beliefs and his request for an accommodation, he would not have been subjected to such treatment.

101.  After denying Plaintiff's request, PSU pressured him to capitulate and get the COVID-19 vaccine with false information that PSU could not accommodate his beliefs. PSU then threatened and disciplined him further, despite his opposition to its actions—a further coercive technique—only to terminate him at the end.

102.  Upon information and belief, PSU imposed the period of threats and intimidation with the intent to punish those who sought religious accommodations; hoping that the constant reminder of termination would result in them abandoning their religious beliefs and surrendering to a coerced injection of a COVID-19 vaccine.

103.  PSU' Policy forced those who were denied religious accommodations into a period of extreme emotional and psychological distress, seeking to coerce religious employees into compliance.

104.  But for his request for religious accommodation, Plaintiff would not have experienced the psychological and emotional distress from the period of threats

and unwarranted discipline where he was constantly pressured to violate his religious beliefs.

105.    PSU terminated Plaintiff for seeking a religious accommodation to its compulsory vaccination Policy. Plaintiff maintained his request for an accommodation through the date of his termination and opposed the PSU actions and inaction, even contacting the EEOC and the Affirmative Action Offices of PSU, participating in the filings of the Charge. PSU terminated Plaintiff in close temporal proximity to his requesting a religious accommodation and opposing the same as well as for participating in said opposition and discriminatory filings. For example, Plaintiff filed an EEOC Charge which was served on January 3, 2022 and was terminated on January 12, 2022.

106.    PSU' actions in forcing those denied accommodations into a period of threat and intimidation and then subsequent termination constitutes retaliation in violation of Title VII.

**COUNT 4**
**PHRA – RELIGIOUS DISCRIMINATION –**
**FAILURE TO ACCOMMODATE**
***Plaintiff v All Defendants***

107.    Plaintiff incorporates herein the previous averments as if fully set forth.

108.    An employee may assert a claim for his employer's failure to accommodate his sincere religious beliefs, so long as the accommodation does not impose

undue hardship on the employer. *See EEOC v. Consol Energy, Inc.*, 860 F.3d 131, 141 (4th Cir. 2017).

109.    To establish a *prima facie* claim for failure to accommodate a plaintiff must present evidence that: "(1) he or she has a bona fide religious belief that conflicts with an employment requirement; (2) he or she informed the employer of this belief; and (3) he or she was disciplined for failure to comply with the conflicting employment requirement." *Id.* (quoting *EEOC v. Firestone Fibers & Textiles Co.*, 515 F.3d 307, 312 (4th Cir. 2008) (quoting *Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 75 (1977)).

110.    Once the plaintiff has made out a prima facie case for discrimination, "the burden then shifts to the employer to show that it could not [reasonably] accommodate the plaintiff's religious needs without undue hardship." *Firestone Fibers*, 515 F.3d at 312 (quoting *Chalmers v. Tulon Co. of Richmond*, 101 F.3d 1012, 1019 (4th Cir. 1996).

111.    Plaintiff clearly established his "bona fide religious belief" and its conflict with the Policy when he submitted his religious accommodation request to PSU. Because Plaintiff could not receive the COVID-19 vaccine without violating his religious beliefs, he could not comply with the Policy and was thus subject to adverse action through termination. While PSU may now attempt to challenge Plaintiff's beliefs, it is not the employer's place "to question the correctness or

even the plausibility of . . . religious understandings." *Consol Energy*, 860 F.3d

at 142.

112.    PSU provided no reasonable accommodations options to Plaintiff, nor did it

engage in the interactive process to attempt to find a workable accommodation

that would not pose an undue hardship to PSU. Even if not a standalone claim,

the failure to engage in a meaningful interactive process signals an employer's

violation of its duty to accommodate because the employer is attempting to

remain purposefully ignorant of potential reasonable accommodations.

113.    To establish the defense of "undue hardship," PSU must demonstrate that any

of the aforesaid accommodations would "bear more than a *de minimis* cost" on

the university. *Hardison*, 432 U.S. at 84. The above stated accommodations

required no additional cost or logistical burden to PSU, as was seen when the

university brought back and accommodated numerous employees from around

the country who also held sincere religious beliefs that prevented them from

taking the vaccine.

114.    The ability to provide reasonable accommodations to employees such as

Plaintiff is also evident by considering other entities including countless hospitals

and even COVID-19 vaccine manufacturers such as Janssen (J&J)—that were

able to accommodate employees with religious based objections to mandatory

COVID-19 vaccination policies. Defendant PSU is thus without excuse as to why it failed also to follow federal employment law in this regard.

115.    The PHRA requires an employer to thoroughly consider all possible reasonable accommodations and not just reject requests out of hand with form denials. "If the accommodation solution is not immediately apparent, the employer should discuss the request with the employee to determine what accommodations might be effective."[6]

116.    Such accommodations might include things such as telework, zoom or Teams meetings and modifications in the schedule. In the face of the reasonable options proposed here, PSU cannot demonstrate even a *de minimis* burden in providing Plaintiff with a religious accommodation(s).

117.    Further, in denying Plaintiff's request, PSU blankly asserted "significant undue hardship" and provided no justification as to why or how the several options he proposed (and were clearly available) were unable to be done without undue hardship. This is especially true where recognition of Plaintiff's natural immunity and/or continued telework or zoom/Teams meetings or modified scheduling (for example) required no cost, effort, or operational change to the status quo.

---

[6] EEOC Guidance Section 12: Religious Discrimination; Part IV, A.2. See also PHRA.

118.    Moreover, PSU was on actual of notice of both the many possible accommodation options for Plaintiff and the fact that the failure to use one of them would result in a Title VII violation. Nonetheless, PSU forged forward with its campaign to eliminate its Christian employees, including Plaintiff.

119.    Therefore, PSU unlawfully discriminated against Plaintiff based on his sincerely religious beliefs by failing to accommodate those beliefs. PSU cannot demonstrate that doing so would have imposed any hardship whatsoever, let alone undue hardship.

**COUNT 5**
**PHRA – RELIGIOUS DISCRIMINATION – DISPARATE TREATMENT**
**HOSTILE WORK ENVIRONMENT - RETALIATION**
***Plaintiff v All Defendants***

120.    Plaintiff incorporates herein the previous averments as if fully set forth.

121.    The PHRA makes it unlawful for an employer to discriminate or retaliate against any of [its] employees . . . because he has opposed any practice made unlawful by the PHRA.

122.    Here, Plaintiff engaged in protected activity under the PHRA when he sought a religious accommodation from the Policy that would otherwise require him to violate his sincere religious beliefs. Then, because of his request for an accommodation, PSU subjected Plaintiff to its sham process in violation of federal law. PSU never intended to accommodate Plaintiff. As a result, he was forced from his employment.

34

123.   Were it not for Plaintiff's religious beliefs and his request for an accommodation, he would not have been subjected to such treatment.

124.   Further, PSU hoped that the constant reminder of possible termination would result in Plaintiff abandoning his religious beliefs and surrendering to a coerced injection of a COVID-19 vaccine.

125.   PSU' Policy forced those who were denied religious accommodations into a period of extreme emotional and psychological distress, seeking to coerce religious employees into compliance.

126.   But for his request for religious accommodation, Plaintiff would not have experienced the psychological and emotional distress from the threat of termination where he was constantly pressured to violate his religious beliefs.

127.   Separately, PSU refused to admit its mistake and accommodate the Plaintiff even after it became apparent that (1) accommodations were available; (2) the COVID-19 vaccines were not preventing contraction of the virus; and (3) individuals with natural immunity possessed superior immunity to those with the vaccine only. Such actions were due to Plaintiff's opposition to PSU' illegal employment law practice. PSU had made up its mind to purge as many unvaccinated religious employees as it believed it could and the position against those seeking accommodations had become entrenched.

128.    PSU's actions forced those denied accommodation into threats, cajoling and

blatant harassment then on to terminate them after an arbitrary specified period

of threats. This constitutes retaliation in violation of the PHRA.

**COUNT 6**
**PHRA – RETALIATION – OPPOSITION/PARTICIPATION CLAUSE**
*Plaintiff v All Defendants*

129.    Plaintiff incorporates herein the previous averments as if fully set forth.

130.    The PHRA makes it unlawful for an employer to discriminate or retaliate

against any of [its] employees . . . because he has opposed any practice made

unlawful by the PHRA.

131.    A *prima facie* case for retaliation requires a showing that (1) he engaged in

activity protected by the PHRA; (2) that an adverse employment action was taken

by the employer; and (3) that a causal link existed between the protected activity

and the adverse action.

132.    Here, Plaintiff engaged in protected activity under the PHRA when he sought

a religious accommodation from the Policy that would otherwise require him to

violate his sincere religious beliefs. PSU continued to oppose Plaintiff's unlawful

practice through his termination.

133.    Then, because of his request for an accommodation, PSU subjected Plaintiff

to its process to coerce him from exercising his rights under federal law. PSU

Policy was not designed to look for a reasonable accommodation for Plaintiff

because PSU never intended to accommodate Plaintiff. Were it not for Plaintiff's Christian beliefs and his request for an accommodation, he would not have been subjected to such treatment.

134.    After denying Plaintiff's request, PSU pressured him to capitulate and get the COVID-19 vaccine with false information that PSU could not accommodate his beliefs. PSU then threatened and disciplined him further, despite his opposition to its actions—a further coercive technique—only to terminate him at the end.

135.    Upon information and belief, PSU imposed the period of threats and intimidation with the intent to punish those who sought religious accommodations; hoping that the constant reminder of termination would result in them abandoning their religious beliefs and surrendering to a coerced injection of a COVID-19 vaccine.

136.    PSU's Policy forced those who were denied religious accommodations into a period of extreme emotional and psychological distress, seeking to coerce religious employees into compliance.

137.    But for his request for religious accommodation, Plaintiff would not have experienced the psychological and emotional distress from the period of threats and unwarranted discipline where he was constantly pressured to violate his religious beliefs.

138.    PSU terminated Plaintiff for seeking a religious accommodation to its

compulsory vaccination Policy. Plaintiff maintained his request for an

accommodation through the date of his termination and opposed the PSU actions

and inaction, even contacting the EEOC and the Affirmative Action Offices of

PSU, participating in the filings of the Charge. PSU terminated Plaintiff in close

temporal proximity to his requesting a religious accommodation and opposing

the same as well as for participating in said opposition and discriminatory filings.

For example, Plaintiff filed an EEOC Charge which was served on January 3,

2022 and was terminated on January 12, 2022.

139.    PSU' actions in forcing those denied accommodations into a period of threat

and intimidation and then subsequent termination constitutes retaliation in

violation of the PHRA.

**COUNT 7**
**VIOLATION OF THE DUE PROCESS CLAUSE OF THE**
**FOURTEENTH AMENDMENT**
**AND THE PENNSYLVANIA CONSTITUTION**
**ARTICLE 1. SECTION 11, ET SEQ.**
**(DEPRIVATION OF A LIBERTY INTEREST IN REPUTATION)**
***All Defendants***

140.    Plaintiff incorporates herein the previous averments as if fully set forth.

141.    Defendants' COVID-19 Policies, practices and customs allow PSU officials

like Defendants Ms. Hnatkovich and Dr. Edmondson to act with complete

unbridled discretion when deciding whether the Plaintiff's Christian Faith is permitted to instruct and inform his choices.

142.    As more fully described above, the decision not to interact with the Plaintiff regarding his religious beliefs in in good faith but rather ostracize the Plaintiff, claim he is not a Christian, call him a liar, and hold him out to others as being a religious fanatic violates the sacrosanct expression of his beliefs and makes him a pariah. Once more, the defendants continue, to this day, blackballing the Plaintiff in his work and future prospects for job positions by preventing him from working on any PSU jobs, even as an independent contractor and by telling others he is not permitted to work for anyone associated with PSU. This has forced his current employer to refrain from bidding jobs for PSU.

143.    As noted by the Third Circuit, "to make out a due process claim for deprivation of a liberty interest in reputation, a plaintiff must show a stigma to his reputation plus deprivation of some additional right or interest." *Hill v. Borough of Kutztown*, 455 F.3d 225, 236 (3d Cir. 2006) (emphasis in original) (citing Davis, 424 U.S. at 701).

144.    Defendants' COVID-19 Policies, practices, customs, and actions accordingly violated Plaintiff's rights under the Due Process Clause of the Fourteenth Amendment to the United States Constitution and the PA Constitution.

WHEREFORE, Plaintiff respectfully prays that the Court grant the relief set forth hereinafter in the Prayer for Relief.

## COUNT 8
## GENETIC INFORMATION NONDISCRIMINATION ACT
### *PSU Only*

145.   Plaintiff incorporates herein the previous averments as if fully set forth.

146.   More than thirty days prior to the institution of this lawsuit, Plaintiff filed a charge with the EEOC alleging violations of GINA, and Title VII, by Defendants. All conditions precedent to the institution of this lawsuit have been fulfilled.

147.   Since at least July 2021, Defendants have engaged in a pattern or practice of employment practices made unlawful by GINA. Specifically, PSU requests genetic information through COVID-19 testing which is clearly used not as a diagnostic tool but for research purposes (see Exhibit A) from unvaccinated and those who have not shared their vaccination status, in violation of, but not limited to, Sections 201(3), 201(4), and 202(b) of GINA, 42 U.S.C. §2000ff (3), §2000ff (4), and §2000ff-1(b).

148.   As more fully described in detail above, Defendants engaged the Plaintiff in DNA testing without his informed consent and in violation of GINA since GINA prohibits employers from the compulsory monitoring of one's DNA through the use of testing for research purposes only.

149.  Since at least July 2021, PSU failed, in violation of Section 207(a) of GINA, 42 U.S.C. § 2000ff-6(a), which incorporates by reference Section 711 of Title VII, 42 U.S.C. §2000e-10, to post and keep posted notices that have been prepared or approved by the EEOC setting forth excerpts from or summaries of the pertinent provisions of GINA and information pertinent to the filing of a charge or complaint.

150.  Since at least June 2021, PSU failed, in violation of Section 709(c) of Title VII, 42 U.S.C. §2000e-8(c) and 29 C.F.R. §1602.12, to create, maintain, and file EEO-1 reports.

151.  The effect of the practices complained of above has been to deprive the Plaintiff of equal employment opportunities and otherwise adversely affect his status as an employee because of genetic information.

152.  The effect of the practices complained above has been to deprive the Plaintiff of equal employment opportunities and otherwise adversely affect his status as an employee because of status as an unvaccinated employee.

153.  The effect of the practices complained of above has been to deprive the Plaintiff of equal employment opportunities and otherwise adversely affect his status as an employee participating in lack of informed consent DNA testing, compulsory testing using his DNA for research purposes only.

154.   The effect of the practices complained of above has been to inflict emotional pain, suffering, and inconvenience upon the Plaintiff who provided genetic information to PSU and other third parties without informed consent.

155.   The unlawful employment practices complained of above were intentional.

156.   The unlawful employment practices complained of above were done with malice and reckless disregard for the federally protected rights.

**COUNT 9**
**FOURTH AMENDMENT ILLEGAL SEARCH AND SEIZURE**
**42 U.S.C. § 1983**
***All Defendants***

157.   Plaintiff incorporates herein the previous averments as if fully set forth.

158.   The Fourth Amendment states: "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated ...." Further, "[t]he Amendment guarantees the privacy, dignity, and security of persons against certain arbitrary and invasive acts by officers of the Government [.]" *Skinner v. Railway Labor Executives' Assn.*, 489 U.S. 602, 613–614, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989).

159.   Defendants, as more fully named above, and based upon its illegal policies, practices and/or customs, or lack thereof, individually and collectively, acted and/or validated the action(s) of, and intentionally intruded upon the Plaintiff's privacy in that they searched and seized his genetic information and/or DNA without his informed consent and permitted, *inter alia*, his personal DNA to be

given to third parties for research purposes only in a compulsory fashion under threat of termination, without his consent, and without justification.

160.   The Plaintiff had a subjectively and objectively reasonable and legitimate expectation of privacy in his DNA (saliva or nasal mucous) being used for research purposes.

161.   A reasonable person would find the intentional, compulsory, malicious, and willful intrusion into the Plaintiff's DNA to be highly offensive and/or morally reprehensible to any reasonable person.

162.   The Defendants had no justification for seizing and/or distributing the Plaintiff's DNA without his consent.

163.   In this regard the Defendants were intentionally or deliberately indifferent to the Plaintiff's privacy rights.

164.   Further, Plaintiff did not and could not have consented to such a search and seizure on the part of the Defendants since he was not made aware of his right to choose not to capitulate to the search, seizure and/or disclosures of his DNA as he had no knowledge of the use of his DNA for third-party research only purposes, therefore any search, seizure or disclosures were involuntary.

165.   Additionally, Plaintiff was forced to endure embarrassment and was placed under threat, explicit or implied, of termination.

WHEREFORE, Plaintiff has suffered damages and demands judgment in his favor to the fullest extent of the law and as per his prayer for relief below.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs prays that this Court:

(a)     Declare PSU violated Title VII and the PHRA by failing to engage in the interactive process in response to Plaintiff's request for accommodations to its Policy and, instead, preemptively denying his request based on pretextual reasons.

(b)     Declare PSU violated Title VII and the PHRA for its failure to provide a reasonable accommodation and disparately treated Plaintiff to his clearly articulated religious beliefs when numerous no-cost options were available.

(c)     Declare that PSU violated Title VII and PHRA by retaliating against Plaintiff for engaging in protected activity through seeking religious accommodation and opposing harassment and retaliatory actions and participating in EEOC proceedings.

(d)     Provide appropriate damages under Due Process, the Fourth Amendment, and GINA including but not limited to the following:

(e)      Award Plaintiff damages, including back pay, front pay, pre-judgment and post-judgment interest, punitive damages (where appropriate under the law), and compensatory damages and other affirmative relief necessary to eradicate the effects of PSU's and the Individual defendants' unlawful employment practices.

(f)      Award Plaintiff damages necessary to make him whole by providing compensation for past and future pecuniary losses resulting from the unlawful employment practices noted above, including pain, suffering, inconvenience, loss of enjoyment of life, humiliation, and loss of civil rights, in an amount to be determined at trial.

(g)      Award reasonable attorney fees and costs; and

(h)      Award such other and further relief that this Court may deem just and equitable.

## **<u>DEMAND FOR JURY TRIAL</u>**

Plaintiff hereby respectfully demands trial by jury on all counts so triable.

DATED this the 3rd day of February 2023.

<u>By: /s/ Jeremy A. Donham, Esquire</u>
Jeremy Donham (206980)
**DONHAM LAW**
714 Venture Drive, Ste. 144
Morgantown, West Virginia 26508
(717) 881-7855 (phone)
Email: J.Donham@Donhamlaw.com

Steven Rinehart (Pro Hac Vice Pending)
**VESTED LAW, LLP**
110 S. Regent Street, Suite 200
Salt Lake City, UT 84111
(801) 456-9728 (Phone)
Email: steve@utahpatentattorneys.com

Charles J. Hobbs (209321)
(Pro Hac Vice)
**THE HOBBS LAW FIRM**
256 E. Market Street
York, PA 17403
(717) 793-2398 (Phone)
Email: chobbs@thehobbslawfirm.com